LOS ANGELES MEMORIAL COLISEUM
COMMISSION, Plaintiff,

v.

NATIONAL FOOTBALL LEAGUE, an
unincorporated association et al.,
Defendants.

OAKLAND RAIDERS, LTD.,
Cross-Claimant,

v.

NATIONAL FOOTBALL LEAGUE, an
unincorporated association et al.,
Cross-Defendants.

Oakland-Alameda County Coliseum,
Inc., Intervenor.

Civ. No. 78–3523–HP.

United States District Court,
C. D. California.

March 17, 1981.

Blecher, Collins & Hoecker, Maxwell M. Blecher, Howard F. Daniels, M. Brian McMahon, Los Angeles, Cal., for plaintiff, Los Angeles Memorial Coliseum Commission.

O'Melveny & Myers, Patrick Lynch, Clark Waddoups, Los Angeles, Cal., Covington & Burling, Hamilton Carothers, Paul J. Tagliabue, Washington, D. C., for National Football League defendants.

Nelson, Ritchie & Gill, Rodney E. Nelson, Richard G. Ritchie, Los Angeles, Cal., Cotchett, Dyer & Illston, Joseph W. Cotchett, Susan Illston, Rand N. White, San Mateo, Cal., for defendants, Los Angeles Rams Football Co. and Georgia Rosenbloom Frontiere.

Alioto & Alioto, Joseph L. Alioto, Lasky, Haas, Cohler & Munter, Moses Lasky, San Francisco, Cal., for cross-claimant, Oakland Raiders, Ltd.

Crosby, Heafey, Roach & May, Edwin A. Heafey, Timothy J. Murphy, Oakland, Cal., for intervenor, Oakland-Alameda County Coliseum.

### MEMORANDUM AND ORDER DENYING MOTION FOR CHANGE OF VENUE

PREGERSON, Circuit Judge, Sitting by Designation.

This matter is before the court on the National Football League's motion for change of venue. Having considered the pleadings, the affidavits, the memoranda of law, and the oral argument of counsel, the court has concluded that the motion for change of venue should be denied.

The NFL's motion, based on 28 U.S.C. § 1404(a), seeks to transfer the case out of the Central District of California. The NFL argues that its due process rights to a fair trial would be denied by holding a trial in Los Angeles, where, the NFL argues, a jury would likely be predisposed to favor the transfer of a second NFL franchise to the Los Angeles Coliseum. The NFL further claims that a transfer is necessary to avoid the risk of a verdict based on juror prejudice, financial interest, and the influence of pretrial publicity. The defendant Los Angeles Rams join in the NFL's motion. Before evaluating the factors to be

considered in ruling on a motion under section 1404(a), a brief review of the history of this case and some of the issues involved may be in order.

## I. BACKGROUND

The Los Angeles Coliseum Commission originally filed its complaint against the NFL on September 13, 1978. The complaint sought to have sections 3.1 and 4.3 of the NFL Constitution and Bylaws, which required a unanimous vote of all NFL teams to permit a transfer of a team's home location, declared invalid as a restraint of trade violative of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. In an order filed February 28, 1979, this court dismissed the complaint with leave to amend on the ground that plaintiff had not adequately alleged standing to bring the action. *Los Angeles Memorial Coliseum Commission v. N. F. L. ("Coliseum I")*, 468 F.Supp. 154 (C.D.Cal.1979). Plaintiff filed a second amended complaint for injunctive relief on March 5, 1979.

The next major event in the case occurred on January 18, 1980, when plaintiff filed a motion for a preliminary injunction against the NFL. The court was told that the Oakland Raiders Football Club had agreed to move its home location to the L.A. Coliseum but that an injunction was necessary to prevent the NFL from blocking the move by requiring, under its newly amended transfer rule, the approval of three-quarters of the NFL members. After a hearing held on February 4, 1980, and the filing of several supplemental briefs, this court granted a preliminary injunction against the NFL in an order filed on February 21, 1980. *Los Angeles Memorial Coliseum Commission v. N. F. L. ("Coliseum II")*, 484 F.Supp. 1274 (C.D.Cal.1980). The Ninth Circuit subsequently stayed the order pending appeal, and later reversed, in an opinion filed December 12, 1980, for lack of a showing of irreparable injury. *Los Angeles Memorial Coliseum Commission v. N. F. L.*, 634 F.2d 1197 (9th Cir. 1980).

In the meantime, the L.A. Coliseum Commission filed a third amended and supplemental complaint adding a damage claim to their claim for injunctive relief. Shortly thereafter, the defendant Oakland Raiders filed a cross claim against the NFL for damages and an injunction. Although the L.A. Coliseum's jury trial demand was included in its third supplemental complaint, filed on March 7, 1980, the Coliseum subsequently indicated a desire to try the case without a jury.[1] The NFL, however, has demanded its right to a trial by jury.

Trial was originally scheduled for November 18, 1980.[2] The NFL's motion for change of venue was filed on September 8, 1980. The motion was taken under submission after oral argument on September 30th. Intensive settlement discussions were held on numerous occasions from October 1980 until February 4, 1981. The Oakland-Alameda County Coliseum was permitted to intervene in the suit by an order filed on January 16, 1981. Supplemental memoranda on the motion for change of venue were received on January 14, January 23, January 29, February 4, February 20, February 24, March 6, and March 12, 1981. Discovery having been substantially completed, several motions for partial summary judgment were filed. Remaining at issue are the following basic claims: (1) the claims of the L.A. Coliseum and the Oakland Raiders that the NFL's three-quarters vote requirement for approval of transfers is both a restraint on trade and an attempt to monopolize, in violation of sections 1 & 2 of the Sherman Act; (2) the L.A. Coliseum's claim for tortious interference with contractual advantage and business relations; and (3) the Oakland Raiders' claim that the NFL's conduct in blocking the Raiders' move to Los

---

1. On February 2, 1981, the L.A. Coliseum filed a motion under Fed.R.Civ.P. 42(b) for a separate, non-jury trial of its equitable claims, to be held before the jury trial on the Oakland Raiders' cross claims. An order denying the motion was filed after a hearing on February 24, 1981. A copy of that order is attached as Appendix I.

2. Pursuant to an October 30, 1980 agreement of counsel, the trial date was continued to February 9, 1981. This date was subsequently rescheduled for March 23, 1981.

Angeles is a breach of the duty of fair dealing. The NFL has responded with the following basic defenses: (1) since the NFL acts as a "single economic entity" in deciding where NFL football will be marketed, the "multiple actors" requirement for a section 1 violation has not been met; (2) blocking the move of the Oakland Raiders to Los Angeles has no substantial effect on competition; (3) the NFL's rule on transfers is valid under the rule of reason and was reasonably applied; (4) the proposed contract between the L.A. Coliseum and the Oakland Raiders would not have received the necessary approval of the appropriate governmental bodies; and (5) the Oakland Raiders Club is precluded from recovering any damages, based on the invalidity of the transfer rule, because of the club's adoption of the bylaws containing the rule and its failure to exhaust intraleague remedies. Trial is scheduled to begin on March 23, 1981.

## II. *FACTORS TO BE CONSIDERED UNDER SECTION 1404(a)*

The statute on which the motion for transfer is based, 28 U.S.C. § 1404(a), reads as follows:

> For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

In ruling on a transfer motion, a district court must consider each of the issues listed in section 1404(a): (1) the convenience of parties; (2) the convenience of witnesses; and (3) the interests of justice. *Kasey v. Molybdenum Corp.*, 408 F.2d 16, 20 (9th Cir. 1969). Moreover, since section 1404(a) was "designed as an attempt to statutorily embody and modify the doctrine of forum non conveniens," *A.J. Industries, Inc. v. United States District Court*, 503 F.2d 384, 386 (9th Cir. 1974), the factors weighed by courts under the old common law doctrine of *forum non conveniens* should also be considered. This remains true even though the court's discretion under section 1404(a) is broader than it was under the doctrine of forum non conveniens. *Norwood v. Kirkpa-*

*trick*, 349 U.S. 29, 32, 75 S.Ct. 544, 546, 99 L.Ed. 789 (1955). Some of those factors, discussed by the Court in *Gulf Oil Corporation v. Gilbert*, 330 U.S. 501, 508–09, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947), are as follows:

> the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive.... relative advantages and obstacles to fair trial.

The basic factors to be considered then, in determining whether, on balance, a transfer to a different forum would allow a case to proceed more conveniently and better serve the interests of justice, are: (1) the plaintiff's choice of forum; (2) the convenience of the parties; (3) the convenience of the witnesses; and (4) the interests of justice.

### A. *Plaintiff's Choice of Forum*

The burden of establishing that an action should be transferred is on the moving party. 1 *Moore's Federal Practice* ¶ 0.145[5], at 1615 (2d ed. 1980); 15 Wright, Miller & Cooper, *Federal Practice and Procedure: Jurisdiction* § 3848, at 244 (1976); *Commodity Futures Trading Comm'n v. Savage*, 611 F.2d 270, 279 (9th Cir. 1979); *Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215, 218 (2d Cir. 1978), *cert. denied*, 440 U.S. 908, 99 S.Ct. 1215, 59 L.Ed.2d 455 (1979). It has also been stated that the plaintiff's choice of venue should not be lightly disturbed. 1 *Moore's Federal Practice, supra* ¶ 0.145[5], at 1616; *Northern Acceptance Trust 1065 v. Gray*, 423 F.2d 653, 654 (9th Cir.), *cert. denied*, 398 U.S. 939, 90 S.Ct. 1844, 26 L.Ed.2d 272 (1970). This is particularly so when the forum chosen is not only the plaintiff's domicile but also has a significant connection with the subject matter of the case. *See, e. g., Pacific Car and Foundry Co. v. Pence*, 403 F.2d 949, 954 (9th Cir. 1968); *American Can Co. v. Crown Cork & Seal Co.*, 433 F.Supp. 333, 338 (E.D.Wis.

1977); *Mayer v. Development Corp.*, 396 F.Supp. 917, 932 n.26 (D.Del.1975). Moreover, the defendant's burden on a transfer motion is said to be especially heavy in antitrust suits, where plaintiff's choice of forum is entitled to particular respect. *See Ford Motor Co. v. Ryan*, 182 F.2d 329 (2d Cir.), *cert. denied*, 340 U.S. 851, 71 S.Ct. 79, 95 L.Ed. 624 (1950); *Star Lines, Ltd. v. Puerto Rico Maritime Shipping Authority*, 442 F.Supp. 1201 (S.D.N.Y.1978).

The plaintiff Los Angeles Coliseum Commission has its headquarters or "domicile" in Los Angeles. Its suit was prompted by the departure of the Los Angeles Rams from the Los Angeles Coliseum and the Coliseum's subsequent inability, allegedly due to the NFL's rule on transfers, to find a replacement NFL tenant. The NFL meeting at which the league formally voted not to approve a transfer of the Oakland Raiders to Los Angeles was held within the Central District. Plaintiff thus claims that this district is where "the defendant ... committed violations of the Act and inflicted the forbidden injuries." *Pacific Car and Foundry Co.*, 403 F.2d at 954, *quoting United States v. National City Lines*, 334 U.S. 573, 583, 68 S.Ct. 1169, 1175 (1948). *See also Commodity Futures Trading Comm'n v. Savage*, 611 F.2d at 278–79. Moreover, one of the NFL's defenses is that the Coliseum's proposed agreement with the Raiders would not have received the approval of the appropriate Los Angeles City and County officials. The NFL also challenges plaintiff's argument that the addition of another NFL team in the Los Angeles area would have a significant effect on local competition for players, coaches, and fans. The Central District thus has a significant connection with the subject matter of the case, and plaintiff's choice of this forum is entitled to considerable weight.

As the "Background" section indicated, the motion for change of venue was filed two years after the filing of the original complaint, and six months after the Coliseum first demanded a jury. Although section 1404(a) sets no limit on the time at which a transfer motion may be made, the passage of time is a factor to be considered.

*Adler v. McKee*, 92 F.Supp. 613 (S.D.N.Y. 1950). Delays of five months have induced courts to refuse transfers that might otherwise have been granted. *See McGraw-Edison Co. v. Van Pelt*, 350 F.2d 361, 364 (8th Cir. 1965) (en banc); *Metropolitan Life Ins. Co. v. Potter Bank and Trust Co.*, 135 F.Supp. 645 (W.D.Pa.1955). *See also Securities & Exchange Comm'n v. Savoy Industries, Inc.*, 587 F.2d 1149, 1156 (D.C.Cir. 1978), *cert. denied*, 440 U.S. 913, 99 S.Ct. 1227, 59 L.Ed.2d 462 (1979); *Henry v. First Nat'l Bank*, 50 F.R.D. 251 (N.D.Miss.), *vacated on other grounds*, 444 F.2d 1300 (5th Cir. 1971), *cert. denied*, 405 U.S. 1019, 92 S.Ct. 1284, 31 L.Ed.2d 483 (1970) (transfer motion, filed three months after the filing of the original complaint, was denied because several motions and preliminary injunction had already been decided).

Finally, the NFL has not requested transfer to any specific district, but has merely suggested several possible alternative locations, e. g., Las Vegas, Phoenix, Sacramento, and Portland. The arguments with respect to transfer have therefore been made in the abstract—the NFL claiming, in essence, that any forum would be better than Los Angeles. The fact that the plaintiff's choice of forum is its home district, however, has been considered sufficient to defeat a motion for transfer, absent concrete indications as to why another *particular* forum was better. *Industrial Solvents Corp. v. Towboat Valley Voyager*, 388 F.Supp. 1055, 1057 (S.D.N.Y.1975).

### B. *Convenience of the Parties*

The present forum serves the convenience of the parties because the plaintiff, the defendant Rams, most of the attorneys, and many of the witnesses are located here. Moreover, the litigation has proceeded in this court for over two years. *See, e. g., Commodity Futures Trading Comm'n*, 611 F.2d at 279 ("The district court was familiar with the case and transfer may have led to delay."); *Securities & Exchange Comm'n v. Savoy Industries, Inc.*, 587 F.2d at 1156 ("'[R]elative docket congestion and potential speed of resolution is an appropriate

factor to be considered.' ... [N]ot only would delay from a crowded docket be present, but also the delay associated with the [transferee] district court's having to prepare itself for this complicated case.").

The NFL has not shown that the present forum is inconvenient for it. Indeed, counsel for both the NFL and the Rams are located here. Therefore, the cost to the NFL, the Rams, and plaintiff of having to transport their counsel to, and house them in, another district, for what the NFL estimates will be a three to five month trial, would no doubt be considerable. *See Altman v. Deramus*, 342 F.Supp. 72, 76 (S.D.N.Y.1972); *Mobil Oil Corp. v. W. R. Grace & Co.*, 334 F.Supp. 117, 124 n.5 (S.D.Tex.1971) ("The cost of counsel's transportation and time in route must be borne by the parties. Therefore this factor directly bears upon the convenience of the parties and costs of litigation."). Thus, unlike the usual transfer motion, where the court is asked to balance an increase in costs for one party against a significant decrease in the costs of another, the transfer requested here would result in greatly increased costs for every party to the suit. The convenience of the parties is therefore another factor weighing against transfer of this action under section 1404(a).

### C. *Convenience of Witnesses*

The convenience of witnesses is said to be the most important factor in passing on a transfer motion. *Saminsky v. Occidental Petroleum Corp.*, 373 F.Supp. 257, 259 (S.D. N.Y.1974); 15 Wright, Miller & Cooper, *supra*, § 3851, at 264 ("If the forum chosen by plaintiff will be most convenient for the witnesses, this is a powerful argument against transfer.").

In assessing the effect of a transfer on the convenience of witnesses, courts consider the effect of a transfer on the availability of certain witnesses, and their live testimony, at trial. *E. g., B. J. McAdams, Inc. v. Boggs*, 426 F.Supp. 1091, 1104–05 (E.D.Pa.1977); *Commercial Solvents Corp. v. Liberty Mutual Ins.*, 371 F.Supp. 247 (S.D.N.Y.1974); *Polaroid Corp. v. Cassel-man*, 213 F.Supp. 379, 382 (S.D.N.Y.1962) ("Depositions, deadening and one-sided, are a poor substitute for live testimony especially where, as here, vital issues of fact may hinge on credibility.").

Witnesses may not be compelled to attend trial unless they can be served with subpoenas within the trial district, or at any place outside of the district that is within 100 miles of the place of trial. Fed.R.Civ.P. 45(e). Thus, transfer may be denied when witnesses either live in the forum district or are within the 100-mile reach of the subpoena power. 15 Wright, Miller & Cooper, *supra* at 267–68; *B. J. McAdams, Inc. v. Boggs, supra* (transfer refused where plaintiff asserted that compulsory process might be necessary to secure the live testimony of witnesses who could not be compelled to testify in the proposed transferee district); *U.S. Industries, Inc. v. Procter & Gamble Co.*, 348 F.Supp. 1265 (S.D.N.Y.1972).

Plaintiff claims that many of its witnesses will be beyond the court's subpoena power if transfer is granted. Among the witnesses, whose names and testimony plaintiff has specified, are members of the Los Angeles County Board of Supervisors, representatives of other Coliseum tenants, and the owners of the Los Angeles Rams and the San Diego Chargers. The last two names, those of the Rams and Chargers owners, are also contained in the NFL's tentative witness list, filed January 14, 1981. The NFL, on the other hand, has not indicated that a transfer is necessary for the convenience of any of its other witnesses. The factor of convenience of witnesses therefore provides additional support for denial of the requested transfer.

### D. *Interest of Justice*

Many considerations have been evaluated by courts under the heading "the interest of justice." One such consideration is whether a speedier trial may be had in one court than another. Transfer has been denied where, as here, a speedier trial could be had where suit was brought than in the proposed transferee court. *E. g., National Super Spuds, Inc. v. New York Mercantile*

*Exchange,* 425 F.Supp. 665 (S.D.N.Y.1977); *In re Fenwick Island, Inc.,* 330 F.Supp. 1191 (E.D.N.C.1971); *Vandusen v. J.C. Penney Co.,* 207 F.Supp. 529, 536 (W.D.Ark.1962).

The most important "interest of justice" consideration before the court in this case is the defendants' claim that transfer is necessary to avoid the risk of an unfair trial. As part of this claim, defendants argue that jurors in the Central District have been exposed to excessive and adverse pretrial publicity. Defendants also argue that jurors in the Central District would screen evidence "through a filter of local financial and political interests, including the real or perceived financial impact of the Raiders' arrival in Los Angeles and the effect of a second NFL franchise on the area's spiritual and economic well-being." These two proposed bases for a transfer—pretrial publicity and juror bias—will be discussed in turn. First, however, it may be helpful to have in mind some background information on the nature of this judicial district.

### 1. *Background*

The Central District of California comprises the counties of Los Angeles, Orange, Riverside, San Bernardino, San Luis Obispo, Santa Barbara, and Ventura. 28 U.S.C. § 84. Although the Los Angeles Coliseum is located in Los Angeles County, the Big "A" Stadium, in which the defendant Los Angeles Rams play, is located in the City of Anaheim in Orange County. The combined population of these seven counties is approximately 10 million. Excluding Orange and Los Angeles Counties, the combined population of the Central District's five other counties is approximately three million. Residents of the Central District engage in many forms of recreation, from hiking and skiing to surfing and spectator sports. Some are fans of local college or nonprofessional teams, while others may root for a variety of professional teams, including the Los Angeles Dodgers, the California Angels, the Los Angeles Lakers, the Los Angeles Kings, and the Los Angeles Aztecs. Still others are probably wholly oblivious to team sports. Such persons may turn for

entertainment to the symphony, a wide variety of music and night clubs, visiting ballets and operas, community theater, church groups, films, or, perhaps even gardening or reading. Thus, the population of the Central District is highly diverse, and its residents are far from homogeneous in their interests and backgrounds.

### 2. *Pretrial Publicity*

Both the NFL and the defendant Rams argue that it will be impossible for them to receive a fair trial in Los Angeles due to "prolonged, extensive, and highly prejudicial" pretrial publicity. In affidavits supporting and opposing the transfer motion, the parties have filed copies of hundreds of articles on various aspects of the case which have appeared in numerous newspapers over the course of a year. According to the affidavits, radio and television stations have also given extensive coverage to this litigation. Defendants focus particular attention on articles published by a local newspaper which, although it has a relatively small circulation, is alleged to be particularly biased against the defendants. *See Los Angeles Coliseum Commission v. NFL,* 89 F.R.D. 489 (C.D.Cal.1981) (memorandum and order granting motions to quash subpoenas served on two *Herald Examiner* reporters). While defendants claim that local media coverage "has consisted in large part of vitriolic attacks on the league, its personnel and its membership," many of the articles filed with this court appear to contain straightforward and neutral reports on the progress of this litigation. Other articles are sharply critical of the Raiders' management and express doubts about the legality or fairness of certain aspects of the Raiders' proposed agreement with the Los Angeles Coliseum. Although the affidavits support the defendants' claim that "[e]very major courtroom event has been reported by the local press," this fact alone does not justify transfer of the case. Moreover, it should be kept in mind that jurors in the Central District hail from Orange County and five other counties besides Los Angeles, and that the defendant Rams have asserted, in a motion to exclude certain evidence from

trial, that "It is certain ... that wherever the action is tried, intense press coverage will continue."

Defendants argue that the pretrial publicity in this district requires the court to grant a transfer, as a matter of due process, even before the court has an opportunity to determine the effect of this publicity in the context of voir dire proceedings. Numerous cases are cited which purportedly support this proposition. On careful reading of these precedents, however, the court concludes that defendants' pretrial publicity argument is based on two types of authority: (1) dicta from cases having nothing to do with either transfers of venue or pretrial publicity, and (2) standards evolved in criminal cases in which extreme and virulent pretrial publicity was found to be coupled with demonstrated effects on prospective jurors.

Citations which fall into the first category include the following Supreme Court cases: *Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1976); *Matthews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); and *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 289 (1970). In *Greenholtz v. Nebraska Penal Inmates*, the Court rejected a due process challenge to prison parole procedures. *Matthews v. Eldridge* held that states were not required to provide an evidentiary hearing prior to the termination of social security benefits. Finally, in *Goldberg v. Kelly*, cited for the proposition that "factfinding based on assertions of fact contained in extra-judicial sources, or upon political, social or financial persuasions occurring outside the record is erroneous factfinding," the Court held that New York City procedures for termination of public assistance payments to welfare recipients did not meet the requirements of procedural due process. Those procedures, among other things, failed to permit welfare recipients to appear personally before the officials charged with making the final decision on the recipients' continued eligibility.

Other cases falling into the first category include *In re Japanese Electronic Products Antitrust Litigation*, 631 F.2d 1069 (3d Cir. 1980); *United States v. Allsup*, 566 F.2d 68 (9th Cir. 1977); *Kiernan v. Van Schaik*, 347 F.2d 775 (3d Cir. 1965); and *In re Union Leader Corp.*, 292 F.2d 381 (1st Cir. 1961). In *In re Japanese Electronic Products*, the Third Circuit held that the Seventh Amendment does not guarantee a right to a trial by jury when a lawsuit is so complex that the jury would not be able to perform its task of rational decision making with a reasonable understanding of the evidence and relevant legal rules. *United States v. Allsup* was a bank robbery case in which the court refused to excuse for cause two prospective jurors who worked for the bank that had been robbed. This and other cumulative errors were held to have resulted in a denial of the defendant's right to a fair trial. *Kiernan v. Van Schaik*, cited for the proposition that "it is well settled that *any* extraneous influences that threaten to deprive a civil litigant of an impartial jury are grounds for transfer," held that the trial court abused its discretion in refusing to ask voir dire questions about prospective jurors' relationships with insurance companies. Finally, in *In re Union Leader Corp.*, cited for the proposition that "the right to be tried before an unbiased [trier of fact] is ... basic to our judicial system," the First Circuit *denied* a petition for a writ of mandamus which sought to transfer a case away from a trial judge who had been personally attacked in many newspaper editorials published by the defendant.

Defendants' second category of authorities, in which extreme and virulent publicity was found to be coupled with demonstrated effects on potential jurors, is highly distinguishable from the instant case. For example, defendants cite five Supreme Court cases: *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Estes v. Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); *Rideau v. State of Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); and *Marshall v. United States*, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959).

In *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), massive and outrageous publicity, both before and during trial, was coupled with the refusal of the trial judge either to question the jurors on whether they had heard certain highly prejudicial mid-trial broadcasts or to admonish the jury to ignore press accounts of the case. The defendant in the case was a doctor accused of murdering his wife. Prior to his indictment for murder, headlines, editorials, and cartoons asked rhetorically why the doctor was not already in jail. A continuous stream of articles purported to contain statements of the defendant and details of his alleged extramarital love affairs with numerous women. The trial began just two weeks before the November general election, in which the chief prosecutor was a candidate for judge and the trial judge was up for re-election. Newspapers published the names and addresses of prospective jurors, who reported receiving numerous phone calls regarding the case. Nearly all the seats in the courtroom were assigned to reporters, whose photographs of the jurors were printed constantly in newspapers during the trial. Every juror stated at voir dire that they had read and heard about the case. The jury's visit to the scene of the alleged crime became a full-scale media event. Moreover, in addition to the judge's refusal to order the jury not to read press accounts of the trial, jurors were allowed to place phone calls during deliberations. On the one occasion the judge questioned the jury regarding publicity during the trial, two jurors admitted having heard the highly inflammatory charge that a prison inmate claimed the defendant was the father of her illegitimate child. According to the Supreme Court, "the judge never considered ... means that are often utilized to reduce the appearance of prejudicial material and to protect the jury from outside influences." 384 U.S. at 358, 86 S.Ct.

at 1519. The Court mentioned several ways of insulating jurors, such as regulating the conduct of journalists in the courtroom, insulating witnesses from interviews with reporters, controlling leaks of information by the prosecution, and proscribing extrajudicial statements by counsel and witnesses on certain prejudicial matters. The Court concluded that, despite the massive and highly prejudicial local publicity, "these procedures would have been sufficient to guarantee [the defendant] a fair trial ...." *Id.*

In *Estes v. Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), the Court was concerned with the impact of live TV and radio coverage of courtroom proceedings on the defendant's due process right to a fair and impartial trial. *Estes v. Texas* was therefore *not* a pretrial publicity case. Justice Clark's "majority" opinion [3] reasoned that live TV cameras had a tendency to distract jurors, pressure witnesses, place extra burdens on the judge, transgress the dignity of the defendant, and interfere with his ability to concentrate. The Court has since characterized *Estes* as a trial lacking due process since "the volume of trial publicity, the judge's failure to control the proceedings, and the telecast of a hearing and of the trial itself" prevented a sober search for the truth. *Nebraska Free Press Ass'n v. Stuart*, 427 U.S. 539, 552, 96 S.Ct. 2791, 2799, 49 L.Ed.2d 683 (1975). Moreover, the Court in *Chandler v. Florida*, —— U.S. ——, 101 S.Ct. 802, 66 L.Ed.2d 740 (1981), recently declined to construe *Estes* as laying down a per se constitutional rule barring live broadcast coverage under all circumstances.

In *Rideau v. State of Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), the Court held that the trial court's refusal of a request for change of venue was a denial of due process where the defendant's confession had been broadcast over TV through-

---

**3.** Justice Clark's opinion received the concurrences of Chief Justice Warren, and Justices Douglas and Goldberg, who also concurred in a separate concurrence by Chief Justice Warren. Justice Harlan concurred in the result, but indicated that the Court's holding should not be read to extend beyond the facts of the case, as

he was not yet prepared to resolve the question addressed in the other concurrences as to whether all live TV coverage was inherently prejudicial. 381 U.S. at 587–96, 85 S.Ct. at 1662–1666. Four other justices dissented in three separate opinions.

out the district. The confession had been obtained by law enforcement officers who interviewed the defendant on tape without an attorney present. The Court also noted that two jurors were deputy sheriffs, who had been kept on the panel over defense counsel's objections.

In *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), the Court held that a trial which resulted in a conviction and death sentence violated the defendant's due process rights when two-thirds of the members of the jury admitted, before hearing any testimony, their belief that the defendant was guilty. Police press releases publicized the defendant's confession to six murders. A barrage of headlines, articles, cartoons, and pictures continued for six or seven months preceding the trial. A change of venue to an adjoining county, which relied on the same news sources as the transferor district, was granted, but a second motion for change of venue was denied on the basis that state law only permitted one change of venue. Motions for a continuance were also denied. Radio and TV revealed the defendant's 20-year-old conviction for arson, a prior conviction for burglary, and a court-martial on AWOL charges during the war. The press also reported the defendant's offer to plead guilty if promised a 99-year sentence, the determination of the prosecutor to secure the death penalty, and the defendant's purported confession to 24 burglaries. Other highly emotional press stories suggested a "pattern of deep and bitter prejudice" in the community, a pattern which was clearly reflected in the voir dire record.

Out of a panel of 430 potential jurors, almost 90% entertained an opinion as to guilt, ranging from mere suspicion to absolute certainty. And eight out of the twelve final jurors stated they thought the defendant was guilty. The facts in *Irvin v. Dowd* are thus quite obviously different from those presented by the instant motion. Nonetheless, the following statement from that opinion, which has been quoted in many opinions since, does have some bearing on the pretrial publicity claims of the defendants here:

> It is not required ... that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest·of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

366 U.S. at 722–23, 81 S.Ct. at 1642–1643 (citations omitted).[4] Finally, in *Marshall v. United States*, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959), jurors read, during the trial, newspaper accounts of the defendant's prior convictions for activities very similar to those for which he was on trial. This evidence had not been admitted at trial, and the Supreme Court ordered that a new trial be granted.

Thus, an analysis of the Supreme Court cases cited by defendants reveals that they involved not only massive pretrial publicity

---

4. *See also United States v. Ferreboeuf*, 632 F.2d 832, 835 (9th Cir. 1980) ("Ferreboeuf was not entitled to a jury composed only of persons who had no prior knowledge of her case."); *United States v. Lamb*, 575 F.2d 1310, 1315 (10th Cir.), *cert. denied*, 439 U.S. 854, 99 S.Ct. 165, 58 L.Ed.2d 160 (1978) ("[S]imply because a prospective juror admits having read newspaper accounts relative to a criminal charge is not in itself sufficient grounds for excusing a jur-

or."); *Calley v. Callaway*, 519 F.2d 184, 205 (5th Cir. 1975), *cert. denied*, 425 U.S. 911, 96 S.Ct. 1505, 47 L.Ed.2d 760 (1976) ("[N]o court has held that the only impartial juror is an uninformed one. We cannot expect jurors to live in isolation from the events and news of concern to the community in which they live."); 2 *The Unabridged Mark Twain: Roughing It* 740–42 (Running Press 1979).

but also flagrant media intrusions during trial. The Court found that jurors had not been properly insulated from these intrusions. Moreover, all five of the cases involved criminal defendants, and in all but *Estes v. Texas*, the prejudicial effects of massive and virulent publicity on prospective and actual jurors was demonstrated.

More recent Supreme Court cases not cited by defendants are also instructive. In *Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975), the issue was whether petitioner was denied a fair trial because members of the jury learned from news accounts about the defendant's prior felony conviction and aspects of the crime with which he was charged. In finding no due process violation, the Court referred to *Irvin v. Dowd, Rideau v. Louisiana, Estes v. Texas,* and *Sheppard v. Maxwell* as cases in which convictions had been obtained in a "trial atmosphere that had been utterly corrupted by press coverage." 421 U.S. at 798, 95 S.Ct. at 2035. The Court further distinguished those cases as follows:

> The proceedings in these cases were entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob. They cannot be made to stand for the proposition that juror exposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process.

Moreover, the court noted that the voir dire record indicated "no ... hostility to petitioner by the jurors who served in his trial." Similarly, in *Dobbert v. Florida*, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977), the Court affirmed the conviction of a man whose trial on charges of torturing, abusing, and murdering children was accompanied by extensive pretrial publicity. The Court cited the *Irvin v. Dowd* quotation set out above, and noted that "the trial judge did everything possible to insure an impartial trial for the defendant," including a careful and extensive examination of prospective jurors. 432 U.S. at 302, 97 S.Ct. at 2303.

Although these cases indicate that the Court will look to the voir dire record to determine whether, as a result of pretrial publicity, potential jurors are prejudiced against a party in the case, the defendants cite the following five district court cases for the proposition that the "pervasive pretrial publicity" in this case "dispenses with the need for, or utility of voir dire": *United States v. Marcello*, 280 F.Supp. 510 (E.D.La. 1968); *United States v. Parr*, 17 F.R.D. 512 (S.D.Tex.1955); *Haase v. Gilboy*, 246 F.Supp. 594 (E.D.Wis.1965); *United States v. Rossiter*, 25 F.R.D. 258 (D.P.R.1960); and *United States v. Florio*, 13 F.R.D. 296 (S.D. N.Y.1952). The first two of these cases involve communities which could be fairly described as "utterly corrupted by press coverage." The remaining cases, however, do not support the proposition for which they are cited. Moreover, defendants neglect either to cite or distinguish numerous other cases, particularly those in this circuit, that indicate that the proper occasion for determining whether a fair and impartial jury can be chosen is during voir dire.

In *United States v. Marcello*, 280 F.Supp. 510 (E.D.La.1968), the defendant's motion for a change of venue from the Eastern District of Louisiana to the Southern District of Texas was granted. Shortly thereafter, however, the defendant moved the court to reconsider its grant of the requested transfer. According to the court, "[t]he only plausible motive supporting such bizarre conduct is that the defendant is now merely seeking to prepare a record for appeal in the event that he is convicted." 280 F.Supp. at 522. The court therefore refused to reconsider the order transferring the case to the Southern District of Texas. The court noted that the defendant had attracted "nefarious publicity" for many years in the transferor district as a "leader of the Cosa Nostra or Mafia in Louisiana." *Id.* at 516. Moreover, a photo showing the basis for the defendant's indictment on assault charges—the defendant striking an FBI agent at an airport—was published conspicuously in local papers, along with stories

about the desire of the governor of Louisiana to "get rid of Marcello." *Id.* at 517. For these reasons, the court stated it was "definitely of the opinion that the publicity which the defendant has received has been so highly pervasive in this area [i. e., the Eastern District of Louisiana] that it would prevent the defendant from receiving a fair and impartial trial in this state." *Id.*

In *United States v. Parr,* 17 F.R.D. 512 (S.D.Tex.1955), the court, on the basis of newspaper clippings and affidavits, made a pre-voir dire finding that, since the defendant had been the subject of so much highly unfavorable publicity (involving a killing and political corruption), his trial for tax fraud should be moved to another district. In another case cited by defendants, however, the court specifically found that the question whether the defendant may be unable to obtain an unbiased jury was "premature." *Haase v. Gilboy,* 246 F.Supp. 594 (E.D.Wis.1965). The court's grant of the requested transfer was therefore based on the "totality of circumstances," including the convenience of the witnesses and the fact that the case could come to trial earlier in the transferee district.

Similarly, the transfer in *United States v. Rossiter,* 25 F.R.D. 258 (D.P.R.1960), was based on the ground that both the witnesses and the defendants, who were indigent, lived in the transferee district. Finally, in *United States v. Florio,* 13 F.R.D. 296 (S.D. N.Y.1952), the last of the defendants' authorities for the proposition that the transfer should precede voir dire, a change of venue was granted, prior to voir dire, because transfer was favored by both the defendant and the government. Indeed, Judge Kaufman noted in that case, but had no occasion to rely on, the technique of voir dire "to minimize or exclude the effects of pre-trial publicity . . . ." 13 F.R.D. at 299.[5]

Defendants' argument that transfer should be granted before voir dire is thus not only based on inapposite cases but also overlooks substantial authority in this and other circuits supporting the use of voir dire under similar circumstances.

It has long been recognized in this circuit that "[t]he effect of pretrial publicity can be 'better determined after the voir dire examination of the jurors.'" *Narten v. Eyman,* 460 F.2d 184, 187 (9th Cir. 1969). For example, in *Silverthorne v. United States,* 400 F.2d 627 (9th Cir. 1968), *cert. denied,* 400 U.S. 1022, 91 S.Ct. 585, 27 L.Ed.2d 633 (1971), Silverthorne's motion for a continuance on the ground that it was necessary to abate the effects of massive adverse publicity was denied by the trial court. The Ninth Circuit held that the denial of this motion was "in the sound discretion of the trial court and a denial of such a motion, prior to the voir dire examination, is not an abuse of that discretion." 400 F.2d at 634. This rule was held to apply to motions for change of venue as well in *Narten v. Eyman, supra.*

In *United States v. Polizzi,* 500 F.2d 856 (9th Cir. 1974), *cert. denied,* 419 U.S. 1120, 95 S.Ct. 802, 42 L.Ed.2d 820 (1975), appellants claimed to have been prejudiced by pretrial publicity linking them to the Mafia. The court quoted the following standard for dealing with pretrial publicity from *Silverthorne v. United States:*

"[T]he trial judge has a large discretion in ruling on the issue of prejudice resulting from the reading by jurors of news articles concerning the trial. . . . [W]hen pretrial publicity is great, the trial judge must exercise correspondingly great care in all aspects of the case relating to publicity which might tend to defeat or impair the rights of an accused. The judge must insure that the voir dire examina-

---

**5.** Two other cases cited elsewhere in defendants' papers may be similarly distinguished. In *Canuel v. Oskoian,* 23 F.R.D. 307 (D.R.I.1959), the defendant union's motion for change of venue on the basis of pretrial publicity and the existence of ongoing state legislative hearings involving the union's activities was denied. In *Wilson v. Great Atlantic & Pacific Tea Co.,* 156

F.Supp. 767 (W.D.Mo.1957), the court denied the defendant's motion to transfer a wrongful death action brought by black plaintiffs because the defendant never answered plaintiffs' affidavits asserting that, among prospective jurors in the transferee district, there was a high degree of racial prejudice.

tion of the jurors affords a fair determination that no prejudice has been fostered." ... In a case of *substantial* pretrial publicity, the voir dire must not simply call for the jurors' subjective assessment of their own impartiality, and it must not be so general that it does not adequately probe the possibility of prejudice.

500 F.2d at 879 (citations omitted). On the basis of these standards, the court then found that pretrial publicity had not been substantial enough to have required the trial judge to interrogate prospective jurors about it at length.

In *United States v. McDonald*, 576 F.2d 1350 (9th Cir.), *cert. denied*, 439 U.S. 830, 927, 99 S.Ct. 105, 312, 58 L.Ed.2d 124, 320 (1978), appellant had sought a change of venue under Fed.R.Crim.Proc. 21(a), which requires a change of venue when there is "so great a prejudice against the defendant that he cannot obtain a fair and impartial trial" in the transferor district. The court stated that "When a Rule 21(a) motion is made 'the ultimate question is whether it is possible to select a fair and impartial jury, and the proper occasion for such a determination is upon the voir dire examination.'" 576 F.2d at 1354 (citations omitted). Moreover, the court noted that "[t]he trial judge has 'a large discretion' in gauging the effects of allegedly prejudicial publicity and in taking measures to insure a fair trial." *Id.*. The court therefore held that appellant had not demonstrated that the district court abused its discretion in denying the motion for change of venue.

In *United States v. Giese*, 597 F.2d 1170 (9th Cir.), *cert. denied*, 444 U.S. 979, 100 S.Ct. 480, 62 L.Ed.2d 405 (1979), the court rejected appellant's argument that the district court had failed to safeguard his right to an impartial jury, uninfluenced by massive prejudicial pretrial publicity. Citing the voir dire standards established in *Silverthorne* and *Polizzi*, the court upheld the trial court's use of the more limited, general questioning technique on the ground that few jurors indicated they were influenced by, or had even seen, coverage of appel-

lants' case in newspapers or on radio and TV. Finally, in *United States v. Ferreboeuf*, 632 F.2d 832, 834 (9th Cir. 1980), the court again quoted the following standard of review established in *United States v. Polizzi*: "Unless a trial judge clearly has erred in his estimation of the action needed to uncover and prevent prejudice from pretrial publicity, an appellate court should not intervene and impose its estimate." In upholding the voir dire procedures followed by the district court against the appellant's pretrial publicity claim, the court stated that the defendant "was not entitled to a jury composed only of persons who had no prior knowledge of her case." *Id.* at 835.

The practice in this circuit of waiting until voir dire to determine the availability of "fair and impartial jurors" is echoed in the opinions of many other courts. For example, in *United States v. Haldeman*, 559 F.2d 31 (D.C.Cir. 1976), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977), the court reasoned that

A judge reviewing pretrial publicity before the *voir dire* would have to attempt to determine from his own reactions how the community would respond to that publicity .... After the *voir dire* a judge can determine which description of the publicity's impact is accurate; before the *voir dire* a judge could only gave [sic] guessed .... Most of the venire simply did not pay an inordinate amount of attention to Watergate. This may come as a surprise to lawyers and judges, but it is simply a fact of life that matters which interest them may be less fascinating to the public generally.

559 F.2d at 62–63 n.37. The court therefore upheld the district court's refusal to grant pre-voir dire requests for a continuance or change of venue, stating that

if an impartial jury actually cannot be selected, that fact should become evident at the *voir dire*. The defendant will then be entitled to any actions necessary to assure that he receives a fair trial.

*Id.* at 63. *See also United States v. Lamb*, 575 F.2d 1310, 1315 (10th Cir.), *cert. denied*, 439 U.S. 854, 99 S.Ct. 165, 58 L.Ed.2d 160

(1978) ("The proper occasion for determining juror partiality is upon voir dire examination."); *United States v. Caldwell*, 543 F.2d 1333, 1342 (D.C.Cir. 1974), *cert. denied*, 423 U.S. 1087, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976); *United States v. Daddano*, 432 F.2d 1119, 1126 (7th Cir. 1970), *cert. denied*, 402 U.S. 905, 91 S.Ct. 1366, 28 L.Ed.2d 645 (1971); *United States v. Cerilli*, 428 F.Supp. 801, 808 (W.D.Pa.1977) ("In tune with the current cases of this Circuit and others, it is at least more expedient to wait until a thorough voir dire before a motion to change venue should be entertained.").

Finally, it should be noted that requests for pre-voir dire transfers are often supported by statistical evidence or the results of opinion polls. *See, e. g., United States v. Haldeman*, 559 F.2d at 64 n.43 (appellants presented a statistical analysis of the district's voting patterns and the results of a poll conducted by a public opinion research company); *United States v. Holder*, 399 F.Supp. 220, 228 (D.S.D.1975) (survey data compiled on the district's high degree of racial prejudice). Since the defendants here have submitted no such evidence, and since the copies of newspaper articles thus far submitted do not compel a conclusion, prior to voir dire, that six [6] fair and impartial jurors cannot be found in this district, the argument that the Central District is not a "fair and impartial" forum due to pretrial publicity must be rejected at this time. The court will remain open, however, to entertaining whatever motions defendants wish to make upon the conclusion of voir dire proceedings.

In the meantime, the court plans to conduct a thorough voir dire to elicit from individual potential jurors their awareness of prior publicity, and the existence of any disqualifying prejudice.[7] The court will also admonish the jurors not to read any newspaper or magazine article, or to listen to any radio or television newscast about this case, or any of the parties involved, until they are discharged from further service as jurors in this case.[8] Finally, the

6. Local Rule 13.1 of the United States District Court for the Central District of California provides that a jury for the trial of civil cases shall consist of six persons. *See Colgrove v. Battin*, 413 U.S. 149, 93 S.Ct. 2448, 37 L.Ed.2d 522 (1973).

7. In examining jurors on pretrial publicity, the court's questioning may include the following:
Have any of you read or heard anything about this case or either of the parties before coming into this courtroom? (If the answer is in the affirmative, then the examination of each juror on the effects of pretrial publicity will be conducted outside the presence of the other jurors.)
What information about this case or any of the parties do you have?
What was the source of your knowledge? What newspapers or magazines do you regularly read? What television news programs do you regularly view?
What radio news programs do you regularly listen to? Have you ever read or heard anything about any of the following: (List specific issues and events submitted by the parties.)
What information do you have on these matters?
What was the source of your knowledge? How would your knowledge of the case, the parties, or any of these matters affect your attitude toward the trial and specifically toward the parties and the merits of this case?
Do you have any opinion or impression about the merits?
Do you have any preconceived notion about the merits of the case?
Can you lay aside any preconceived notion or impression or opinion and render a verdict based solely on the evidence and on the court's instructions?
Do you understand that what we want is a trial by an impartial jury, that is, by jurors who have no bias or prejudice that would prevent them from returning a verdict according to the law and the evidence?
Is that clear to you? Do you believe you are such a juror? Why?

8. A complete admonition to jurors, to be given at least daily during the trial, might read as follows:
Ladies and Gentlemen, at this time the court again admonishes you that you are not to discuss this case among yourselves or with anyone else until the case is finally submitted to you. The case will be submitted to you after you have heard all the evidence, the argument of counsel, and the court's instructions on the law that applies to the case.
The court further admonishes you that you are not to read any newspaper or magazine article, or to listen to any radio or television newscast about this case, or any of the parties involved, until you are discharged from further service as jurors in this case.

court intends to grant all parties the maximum number of peremptory challenges allowable under 28 U.S.C. § 1870.

### 3. *Juror Prejudice*

Although defendants claim that potential Central District jurors have "emotional" or "political" biases prejudicial to defendants, there has been no attempt to compile any statistical or survey data to substantiate this claim. Moreover, since the court can easily imagine that many persons in this district have no interest in either professional sports or football, any decision on the extent of alleged "emotional" or "political" biases must await further substantiation in the context of the voir dire. It is necessary to turn then to the only aspect of defendants' bias claim on which there is both concrete evidence and substantial precedent, i. e., the claim that Central District jurors have a financial interest in the outcome of this case.

This claim is based on statements by L.A. Coliseum officials that the failure to secure the Raiders as a principal tenant will result in a deficit to be carried by local taxpayers. To support the argument that such an interest renders a forum inappropriate, the NFL cites a state statute requiring actions brought by a county, city or local agency against non-residents of that county or city to be transferred to a court in a community other than that in which the plaintiff is situated. Cal.Civ.Proc.Code § 394(1). Since venue in the federal courts is statutory and procedural, however, neither the Rules of

Decision Act, 28 U.S.C. § 1652, nor the doctrine of *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), applies, and state law cannot control federal venue. *See Miller v. Davis*, 507 F.2d 308, 316–17 (6th Cir. 1974) ("Federal courts should apply *federal* venue rules and need not follow contrary state law."); *Brown v. Pyle*, 310 F.2d 95 (5th Cir. 1962); *Taylor v. Titan Midwest Const. Corp.*, 474 F.Supp. 145 (N.D.Tex.1979) (contractual venue provision enforced despite state law to the contrary); *R.S. Mikesell Assoc. v. Grand River Dam Authority*, 442 F.Supp. 229 (E.D. Okl.1977).

In further support of its "financial interest" argument, the NFL cites *Withrow v. Larkin*, 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975); *Commonwealth Coatings Corp. v. Continental Casualty Co.*, 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968); *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927); and *Chestnut v. Ford Motor Co.*, 445 F.2d 967 (4th Cir. 1971). None of these cases, however, supports the proposition that prospective jurors who are taxpayers of a certain municipality should be disqualified from jury service in cases involving that municipality's governmental or quasi-governmental agencies.

The NFL relies on the following dicta in *Withrow v. Larkin*, 421 U.S. at 47, 95 S.Ct. at 1464:

various situations have been identified in which experience teaches that the probability of actual bias on the part of the

---

Now, ladies and gentlemen, you should not feel that you will be inconvenienced as a result of this order, because as a juror you will learn first-hand about this case right here in the courtroom. And I do not impose this order because of any lack of confidence in you. This order is imposed so that no one at any time in the future will be able to say that anything which may have appeared in print, or may have been broadcast on radio or television, during the course of this trial, had any influence on your deliberations or on your determination of the issues in this case.

In addition, if during the course of the trial any publicity concerning this case comes to your attention, you are directed to notify the court of that situation at once in a signed note, which you should deliver to the bailiff.

Another important matter: While the trial is in progress, give everyone connected with this case a wide berth—that includes the attorneys, the witnesses, and the parties. Don't even direct a "good morning" or "good evening" or exchange any sort of greetings with any of them because someone fifty feet away may misinterpret a routine courtesy. It is best that you give everyone connected with this case a very wide berth.

It is very important, ladies and gentlemen, that you strictly adhere to the court's admonitions. Again, keep in mind that you are going to get all the evidence you need to decide this case right here in the courtroom. It would be unfair to the parties and violate our system of justice for you to be subjected to any outside influences.

judge or decision maker is too high to be constitutionally tolerable. Among these cases are those in which the adjudicator has a pecuniary interest in the outcome and in which he has been the target of personal abuse or criticism from the party before him.

This statement, however, was totally unrelated to any issue before the Court. In *Withrow*, the question was whether due process was violated by a state medical examining board which temporarily suspended a doctor's license at a contested hearing on charges evolving from the board's own investigation. The Court held that the district court had abused its discretion in issuing a preliminary injunction against the Board since the district court's finding that the doctor would likely succeed on the merits was clearly wrong. Thus, the Court in *Withrow* was faced neither with a claim that the Board had a financial interest in the outcome, nor that persons with an interest as attenuated as that alleged in this case should be barred from serving on a jury.

Similarly, *Commonwealth Coatings Corp. v. Continental Casualty Co.*, 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968), rather than being a case involving taxpayer jurors, involved an arbitration, under the Federal Arbitration Act, of a dispute between a subcontractor and a prime contractor over money due on a painting job. The Supreme Court held that the subcontractor was entitled to have the arbitration award set aside when no one had disclosed to the subcontractor that the prime contractor was actually a regular customer of the third, and supposedly neutral, member of the arbitration panel.

In *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927), the Court found that a municipal ordinance violated due process because it permitted a mayor, who sat as a judge for certain offenses, to collect his costs from the persons he convicted. In response to an issue raised by the municipality, the Court discussed whether a *citizen* of a municipality could sit as a juror where the city is a party or where the city, by receipt of fines, might benefit from a conviction or a ruling in its favor. While noting that such a practice might have been barred under the strict common law rule, the Court stated that "the strict rule seemed to be inconvenient, impracticable, and unnecessary and . . . such remote or minute interest in the litigation might . . . not . . . be a reason for disqualification of a judge or a juror." 273 U.S. at 528, 47 S.Ct. at 443.[9] Similarly, *Connally v. Georgia*, 429 U.S. 245, 97 S.Ct. 546, 50 L.Ed.2d 444 (1977), cited by the defendant Rams, found that issuance of a search warrant violated due process where the issuing officer was not salaried, but received a statutory fee only on the *granting* of requested warrants. These cases thus involved statutory schemes by which triers of fact were directly compensated for reaching certain results, i. e., a conviction or a finding of probable cause for a search. In neither was it suggested that taxpayers should be disqualified as triers of fact for remote and unmeasurable interests in the possible effects of their decisions on sources of municipal revenues. Finally, in the last case cited by defendants, *Chestnut v. Ford Motor Co.*, 445 F.2d 967 (4th Cir. 1971), a juror was held to be disqualified because he owned stock in the defendant company.

A financial interest argument similar to that raised by the NFL was rejected in *Virginia Elec. & Power Co. v. Sun Shipbuilding & Dry Dock Co.*, 389 F.Supp. 568 (E.D.Va.1975). In that case, a Virginia power company had brought an action against a Pennsylvania manufacturer for breach of contract. Noting that the forum district was served exclusively by the plaintiff power company, the defendant manufacturer moved for a change of venue. The

---

9. The Court also quoted the following passage from *City Council v. Pepper*, 1 Rich. 364, 366 (S.C.1845):

The sum thus to be recovered goes in exoneration of some part of the burden of government to which every citizen is subjected; but such an interest has no effect upon the mind. It is too slight to excite prejudice against a defendant.

273 U.S. at 530, 47 S.Ct. at 443.

defendant argued that all jurors living in the district would have a financial interest in the outcome by virtue of their consumption of electricity sold by the power company, and by the fact that, under Virginia law, the plaintiff would be required to pass along to its customers in rate reductions any substantial verdict it might win against the defendant. The prospective juror interest in the outcome in that case was thus not only district-wide but also more direct and foreseeable than that alleged here. The court denied the motion for transfer, however, on the ground that the defendant's approach was "a novel one.... without direct support from any authority [and] [i]f followed it would deny utilities their home venue in all except the most minor of cases." 389 F.Supp. at 571. The court noted that, of all the authorities cited, the one coming closest to answering the question was *Tumey v. Ohio*, discussed above. The court also observed that

> every United States Judge is a citizen of the United States and yet he is not considered disqualified to impose substantial fines payable to the United States. Jurors who are citizens of the Commonwealth of Virginia may impose substantial fines payable to the Commonwealth.... The commissioners as free holders of a municipality determine the award in condemnation cases despite the fact that the amount of the award could affect the amount of taxes each might have to pay as a citizen of the municipality.... The point seems to be that *even though it is clear there will be a financial impact upon the trier of fact, if that impact is insubstantial or insignificant, the trier of fact is not disqualified.*

*Id.* (Emphasis added.)

The court's reasoning in *Virginia Elec. Power Co.* is equally applicable here. The NFL's argument that a transfer out of the Central District is necessary on the basis that Los Angeles taxpayers will have a financial interest in the outcome is therefore rejected.

## CONCLUSION

The NFL's motion for a change of venue prior to the conduct of voir dire proceedings is hereby denied. Three of the factors to be considered under 28 U.S.C. § 1404(a)—the plaintiff's choice of forum, the convenience of the parties, and the convenience of the witnesses—weigh heavily against a transfer. Defendants have suggested two important "interest of justice" considerations, i. e., pretrial publicity and juror prejudice. The court has concluded, however, that the effects of pretrial publicity and potential juror prejudice can be better determined after the voir dire examination of the jurors. Thus, the court will remain open to entertaining whatever motions defendants wish to make on these subjects at the conclusion of voir dire proceedings.

### Appendix I

*Minute Order: Ruling on L.A. Coliseum Comm'n's Motion for a Separate, Non-Jury Trial of its Claim for an Injunction*

Date of Hearing: 2/24/81

The cases that control the disposition of this motion are *Beacon Theatres Inc. v. Westover*, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959) and *Calnetics Corp. v. Volkswagen*, 532 F.2d 674 (9th Cir. 1976).

In *Ross v. Bernhard*, 396 U.S. 531, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970), the Supreme Court stated the *Beacon Theatres* rule as follows:

> [W]here equitable and legal claims are joined in the *same action*, there is a right to jury trial on the legal claims which must not be infringed either by trying the legal issues as incidental to the equitable ones or by a court trial of a common issue existing between the claims.

396 U.S. at 537–38, 90 S.Ct. at 737–738 (emphasis added). *See also Myers v. United States District Court*, 620 F.2d 741, 744 (9th Cir. 1980) ("Even if the contention that Myers' counterclaim is primarily equitable were true, denying Myers a jury trial on his legal counterclaim merely because it was incidental to his equitable claim would directly contradict the principle stated in *Ross v. Bernhard, supra.*"). The legal and equi-

table issues here are joined in the *same action*: both the plaintiff L.A. Coliseum and the Oakland Raiders Club, a cross-claimant, have claims for both an injunction and treble damages. According to the Supreme Court in *Beacon Theatres*:

> Since the right to jury trial is a constitutional one ... while no similar requirement protects trials by the court, [the court's] *discretion is very narrowly limited and must, wherever possible, be exercised to preserve jury trial.* As this Court said in *Scott v. Neely*: "In the Federal courts this [jury] right cannot be dispensed with, except by the assent of the parties entitled to it; nor can it be impaired by any blending with a claim ... of a demand for equitable relief in aid of the legal action, or during its pendency." This long-standing principle of equity dictates that *only under the most imperative circumstances*, circumstances which in view of the flexible procedures of the Federal Rules we cannot now anticipate, can the right to a jury trial of the legal issues be lost through prior determination of equitable claims.

359 U.S. at 510–11, 79 S.Ct. at 956–957 (citations and footnotes omitted) (emphasis added). The L.A. Coliseum has presented no imperative circumstances that might require this unusual move. *See also* 359 U.S. at 508 n.10, 79 S.Ct. at 955 n.10 ("Since the issue of violation of the antitrust laws often turns on the reasonableness of a restraint on trade in the light of all the facts ... it is particularly undesirable to have some of the relevant considerations tried by one factfinder and some by another.").

The L.A. Coliseum has asserted that the Oakland Raiders would be willing to waive the collateral estoppel effect of a determination in favor of the Coliseum on the injunction issue. The Coliseum also argues that, under *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), when two parties bring legal and equitable claims in the same action, the court may try the equitable claims first without violating the defendant's Seventh Amendment rights. *Parklane Hosiery*, however, merely established rules on the offensive use of collateral estoppel. Plaintiffs in a stockholders' class action were permitted to use a determination against the defendants in a prior SEC injunction action as collateral estoppel, partly because the stockholder plaintiffs *could not have easily joined in the prior action.* Here, however, since the Oakland Raiders Club is a necessary party and is already a defendant/cross claimant in the case, *Parklane Hosiery* is inapplicable. The Ninth Circuit discussed a similar situation in *Calnetics Corp. v. Volkswagen*, 532 F.2d at 690 n.25:

> Calnetics did not offer to waive the collateral estoppel effect of the § 7 equitable determination on remand. But even if it had, we would be inclined to remand for a consolidated trial because of the threat of inconsistent determinations.

Therefore, in light of the foregoing authorities, and bearing in mind the overriding Seventh Amendment right of jury trial considerations discussed in *Beacon Theatres*, the L.A. Coliseum's motion for a separate, non-jury trial of its equitable claims is hereby denied.