UNITED STATES of America,
Plaintiff-Appellee,

v.

Henry James McDONALD,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Marcus T. BAUMANN,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Allan J. BESBRIS, Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Hayes G. STEWART,
Defendant-Appellant.

Nos. 77–2605, 77–2702, 77–2677
and 77–2721.

United States Court of Appeals,
Ninth Circuit.

May 4, 1978.

Rehearing Denied in No. 77–2677
June 7, 1978.

Jeffrey R. Feller, O. J. Wilkinson, Jr. of Wilkinson & Quarelli, Phoenix, Ariz., Richard A. Johnson, Payson, Ariz., for defendants-appellants.

Dale Danneman, Asst. U. S. Atty., Phoenix, Ariz., for plaintiff-appellee.

Before WRIGHT and CHOY, Circuit Judges, and POOLE, District Judge.*

EUGENE A. WRIGHT, Circuit Judge:

An Arizona land fraud scheme which operated from 1967 to 1974 resulted in the conviction of these appellants on counts of mail fraud [18 U.S.C. §§ 1341–42], interstate transportation of fraudulently obtained property [18 U.S.C. § 2314], and aiding and abetting [18 U.S.C. § 2]. After considering the assignments of error presented by each appellant, we conclude that the convictions should be affirmed as to all except McDonald. His conviction is reversed.

## I.

### FACTS

Jacob Hood formed Western Land Sales (Western) in 1966 to sell Arizona real estate. It sold subdivision lots on contracts, title remaining in trust until a release price was paid.[1] In 1969 Western contracted with Banker's Finance and Holding Company (Banker's) to market the contracts held by Western. Banker's discounted contracts to investors, collected from the buyers of lots, and issued checks for each lot's release from trust. Periodic payments received by Banker's were forwarded to the contract assignee-investors.

Western later signed several subdivision trust agreements requiring payments to be made to the trusts irrespective of lot sales. As a result, its need for ready cash grew. It engaged McDonald Investment Company (MIC) as a second agent for marketing land sale contracts to investors for a commission.

MIC's owner, appellant McDonald, asked for safeguards to insure the soundness of the contracts. Western was to guarantee the contract assignments,[2] place other contracts in escrow to cover defaults, and arrange for an independent agency to collect contract installments and forward them to investors. Credit checks on lot buyers were made at McDonald's request. Western supplied him with its financial statement and recorded the contracts brokered through MIC with the contract assignees shown as first mortgagees.

---

* Of the Northern District of California.

1. Typically, Western would obtain an interest in a tract of land with title held in trust by the owner. The trust agreement gave Western the right to subdivide into lots. As lots were sold, a "release price" was paid into the trust and the trustee issued a deed for those lots in the name of Western.

Lot purchasers contracted for a down payment and subsequent monthly installments of the purchase price. Western held the deeds as security until final payment.

2. Contracts were assigned with "full recourse" against Western in the event of default by the contract lot purchaser.

In the course of this business, Western's receipts from sales of legitimate contracts proved insufficient to cover operating expenses. Western and its agents then wrote spurious contracts of sale to persons who never intended to make payments on them.[3] These "fenceposted" contracts were then sold to investors through Banker's or MIC or pledged as security for loans to Western or Hood. In a few instances the signatures to the contracts were outright forgeries.

At the same time Western continued to contract with legitimate buyers and those contracts were marketed through the same agents. At Western's office Hood kept secret separate files on the fraudulent contracts.

To conceal the fraud Western and Hood supported the forged and fenceposted contracts by making periodic payments on them. These were sent to Banker's, which collected payments on the contracts it had sold, or to Central Service Bureau (CSB), which was employed by Western to collect payments on other assigned contracts. Banker's and CSB forwarded these receipts to the assignees.

Western's financial success depended on continuing brisk sales of contracts because those receipts were the source of periodic payments on bogus contracts. Whenever Western was making payments either because of default by the original obligor or because the contract was a fraudulent one, the assignee was not notified.

CSB kept computer records on all contracts it serviced and indicated in code the contracts on which Western was making the payments. The genuineness of contracts was not readily ascertainable by others, however, and because investors generally received regular payments, their suspi-cions were not aroused until the operation collapsed.

In 1971 the Securities and Exchange Commission investigated Western which agreed to stop interstate sales of unregistered land sale contracts. Western moved quickly to avoid SEC regulation, however, by selling contracts for sales of lots with cabins and by selling corporate promissory notes secured by first mortgages on lots with cabins.[4] To further the scheme, Hood falsified appraisals to show the existence of cabins where none were built. In truth, of a total of 800 lots, only 12 had cabins. Many lots were assigned twice and some were never released from trust.

In August 1973, Western defaulted on its obligations. Few note holders were able to obtain their lots and those who could found no cabins on them. Many contract assignees discovered that they were holding worthless paper.

On January 12, 1977, a federal grand jury indicted 16 defendants with 54 violations of federal law. Several pleaded guilty, including Jacob Hood, who became a prosecution witness. Others proceeded to trial in two groups. The appellants here were jointly tried and convicted on several counts. Crowell, a co-defendant, was found not guilty.

Each assignment of error is discussed separately.

## II.

## DISCUSSION

A. *Pretrial Publicity.*

Appellant Besbris first asserts that the trial court erred in denying his motion for change of venue due to prejudicial pretrial publicity.[5] He also contends that the limit-

---

3. Sham buyers signed contracts with the assurance that they were not expected to make payments. Some of them were paid $50 for their signatures.

4. The changes in practice reflected an attempt to avoid the registration requirements of the Securities and Exchange Act of 1933 by marketing instruments within the exemption of Rule 234, 17 C.F.R. § 230.234 (1977). The fraudulent character of the scheme, however, remained unchanged.

5. Besbris, an attorney admitted to practice in California and Arizona, worked for Western for five months late in 1971 and early in 1972. He was convicted of seventeen counts of mail fraud, aiding and abetting and interstate transportation of fraudulently obtained property. While at Western he served as corporate secretary and house counsel.

ed voir dire by the district judge was inadequate in light of the publicity.

■ Besbris argues that extensive Arizona press coverage of land fraud schemes at the time of trial created a reasonable likelihood that he could not receive a fair trial in the District of Arizona.[6] He claims that the trial judge "perfunctorily" denied his change of venue motion when the circumstances required that it be granted under Fed.R.Crim.P. 21(a).[7]

The publicity of which Besbris complains, however, consisted primarily of news stories of Arizona's fraud-ridden real estate business. Besbris was mentioned by name but once, several months before trial, when he was indicted. Articles dealt with land frauds generally and did not focus on these defendants. In this respect, Besbris' appeal differs significantly from those in which prejudicial publicity has been found to have impaired a defendant's right to a fair trial. *E. g., Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Silverthorne v. United States,* 400 F.2d 627 (9th Cir. 1968).

Rule 21(a) requires a change of venue when there is in the district "so great a prejudice against the defendant that he cannot obtain a fair and impartial trial . . . ." We do not agree with appellant that general press coverage of Arizona land fraud created such prejudice against him. When a Rule 21(a) motion is made "the ultimate question is whether it is possible to select a fair and impartial jury, and the proper occasion for such a determination is upon the voir dire examination." 8A Moore's Federal Practice ¶ 21.10[3], at 21–10 (1977) (*quoting Blumenfeld v. United States,* 284 F.2d 46, 50 (8th Cir. 1960), *cert. denied,* 365 U.S. 812, 81 S.Ct. 693, 5 L.Ed.2d 692 (1961)). *See Silverthorne v. United States,* 400 F.2d at 639–40. *See generally* ABA Standards Relating to Fair Trial and Free Press § 3.2, 119–124 (Approved Draft 1968).

■ The trial judge has "a large discretion" in gauging the effects of allegedly prejudicial publicity and in taking measures to insure a fair trial. *United States v. Polizzi,* 500 F.2d 856, 879 (9th Cir. 1974), *cert. denied,* 419 U.S. 1120, 95 S.Ct. 802, 42 L.Ed.2d 820 (1975); *Silverthorne v. United States,* 400 F.2d at 637–38. Besbris has not demonstrated that denial of his motion for change of venue was an abuse of discretion.

He further contends, however, that the trial judge's voir dire was inadequate because jurors were not questioned individually and because the questions proffered by defense counsel were not asked. In analyzing this claim we begin with the proposition that

[u]nless a trial judge clearly has erred in his estimation of the action needed to uncover and prevent prejudice from pretrial publicity, an appellate court should not intervene and impose its estimate.

---

6. Appellant supplemented the record with the transcript of a hearing on a motion for change of venue in an unrelated land fraud prosecution originally scheduled for trial in Phoenix, later moved to Prescott, Arizona, and then to San Diego, California. In that case one reason for the venue change from Prescott to San Diego was extensive pretrial publicity. Appellant considers the transcript germane to the change of venue he sought and was denied.

The United States Attorney supplemented the record with the affidavit of the government's trial attorney in that case. It reveals that the motion there was unopposed. Furthermore, that trial involved a second group of defendants linked to an illegal scheme for which many of their associates had already been convicted. The defendants had been named repeatedly in the press. Moreover, limited courtroom facilities in Prescott made it

undesirable for the lengthy trial contemplated there.

Even were we to consider the publicity in this case comparable to the publicity in that one, it would be far simpler to find impartial veniremen in a city the size of Phoenix than in Prescott.

7. Rule 21. Transfer From the District for Trial.

(a) For Prejudice in the District. The court upon motion of the defendant shall transfer the proceeding as to him to another district whether or not such district is specified in the defendant's motion if the court is satisfied that there exists in the district where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial at any place fixed by law for holding court in that district.

The court closest to the situation can best evaluate the proper way to walk the difficult line between a vigorous voir dire to determine any possible bias and avoidance of creating bias by specific questions which add 'fuel to the flames' in suggesting the presence of controversial issues.

*United States v. Polizzi*, 500 F.2d at 880 (citations omitted).

■ Relying on *Silverthorne*, Besbris asserts that a voir dire examination that calls only for the jurors' subjective assessment of their own impartiality is inadequate and that general questions addressed to the entire panel do not adequately protect a defendant. The assertion is correct as far as it goes. But we recently explained that, although rigorous voir dire of prospective jurors is required when pretrial publicity is great,

> [i]n cases of less publicity, . . . these procedures are not required. Several general questions addressed to the entire panel of jurors, followed by individual questions of jurors who respond affirmatively to the initial inquiries, may be sufficient if it becomes clear that few jurors have any knowledge *of the case.*

*United States v. Giese*, 569 F.2d 527 (9th Cir. 1978) (emphasis added) (citations omitted).

In this case the court considered the request for individual voir dire but concluded that, although there had been considerable publicity about land fraud, it was clear that few jurors had knowledge of the case before them. In these circumstances there was no abuse of discretion. *United States v. Polizzi*, 500 F.2d at 880. "Only in a case involving extreme pretrial publicity, with demonstrated effects on the prospective jurors, have we held that a trial court's voir dire was inadequate." *United States v. Giese*, 569 F.2d at 541 (*citing Silverthorne, supra*). This is not such a case.

## B. *Severance.*

Stewart, Besbris, and Baumann contend it was error to try them jointly. They argue that joinder was improper under Fed. R.Crim.P. 8(b) and, alternatively, that the joint trial was so prejudicial as to require that their motions for severance under Fed. R.Crim.P. 14 be granted.

It cannot seriously be contended that they were improperly joined for trial under Rule 8(b), for they "participated in the same series of acts or transactions constituting an offense or offenses." *United States v. Roselli*, 432 F.2d 879, 898 (9th Cir. 1970), *cert. denied*, 401 U.S. 924, 91 S.Ct. 883, 27 L.Ed.2d 828 (1971). *See also United States v. Barney*, 568 F.2d 134, 135–36 (9th Cir. 1978); *United States v. Satterfield*, 548 F.2d 1341, 1344 (9th Cir. 1977).

The argument that the trial court erroneously denied their motions for severance under Rule 14 also lacks merit. They maintain that during the joint trial the jury heard considerable evidence not properly admissible against them and that they were prejudiced as a result.

Some prejudice necessarily inheres when defendants are joined for trial. However, "[i]f all that was necessary to avoid a joint trial were a showing of prejudice, there would be few, if any, multiple defendant trials." 8 Moore's Federal Practice ¶ 14.-04[1], at 14–14.1 (1977).

■ Considerations of judicial economy merit serious attention when defendants move for severance. The decision whether the prejudice attending a joint trial outweighs the need to conserve judicial resources and to avoid further crowding of federal trial calendars with a succession of factually related actions is, in the first instance, committed to the sound discretion of the district court. *United States v. Kennedy*, 564 F.2d 1329, 1334 (9th Cir. 1977); *United States v. Brashier*, 548 F.2d 1315 (9th Cir. 1976), *cert. denied*, 429 U.S. 1111, 97 S.Ct. 1149, 51 L.Ed.2d 565 (1977).

■ Appellants carry the difficult burden of demonstrating undue prejudice resulting from a joint trial, and we will reverse the trial court only in those rare instances where the refusal to sever amounts to an abuse of discretion. *United States v. Campanale*, 518 F.2d 352, 359 (9th Cir. 1975), *cert. denied sub nom., Grancich*

*v. United States*, 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1976).

■ The appellants here point only to the slight prejudice resulting from any joint trial and the disparity of proof as to each defendant. They have not demonstrated that the jury could not reasonably have been expected to compartmentalize the evidence as it related to each defendant in light of its volume and limited admissibility. *United States v. Gaines*, 563 F.2d 1352, 1355 (9th Cir. 1977); *United States v. Kaplan*, 554 F.2d 958, 967 (9th Cir. 1977).[8]

Besbris presents the related argument that the evidence at trial demonstrated the existence of at least four distinct fraudulent schemes rather than the one charged in the indictment. We disagree. Although the defendants entered and left the operation at different times, there was no fatal variance rendering the joint trial improper. The evidence was sufficient to present the issue whether there was a single scheme or multiple schemes as a question for the jury. *United States v. Porter*, 441 F.2d 1204, 1213 (8th Cir.), *cert. denied*, 404 U.S. 911, 92 S.Ct. 238, 30 L.Ed.2d 184 (1971).

The circumstances of appellants' joint trial present no reversible error.

C. *Admissibility of Evidence.*

■ Besbris charges error in the court's admission of testimony regarding his actions in another real estate promotion and statements he made to the effect that persons investing in high risk ventures "de-

serve to be screwed." He argues that the evidence was irrelevant and highly prejudicial.

On direct examination Besbris claimed no knowledge of Western's fraudulent activities. One witness then testified that Besbris subsequently advised a real estate developer about circumvention of subdivision laws and participated again in deals involving fenceposted contracts. This testimony was relevant to show Besbris' motive, intent, and knowledge as to the fraudulent conduct with which he was charged. So, too, was that as to his contempt for investors.

■ Fed.R.Evid. 404(b)[9] permits admission of evidence of other acts to prove motive, intent, and knowledge but it must be excluded where it serves only to prove criminal disposition. *See* 2 Weinstein's Evidence ¶ 404[08] (1977). Whether its probative value sufficiently outweighs its potentially prejudicial impact is a decision committed to the sound discretion of the trial court. *United States v. Riggins*, 539 F.2d 682, 683 (9th Cir. 1976), *cert. denied*, 429 U.S. 1045, 97 S.Ct. 749, 50 L.Ed.2d 758 (1977).

Besbris put his knowledge and intent in issue, and the challenged evidence was relevant on those points. Its introduction may have generated some prejudice but we cannot say that the trial judge failed to strike the proper balance. There was no abuse of discretion and no error.[10]

---

8. The trial judge was aware that some evidence related to less than all defendants. In those instances he carefully instructed the jury on the limited consideration such evidence should receive. The admonitions adequately safeguarded the defendants' rights.

The sum of appellants' argument is that they stood a better chance of acquittal had they been separately tried. That is too insubstantial a basis to establish an abuse of discretion. *United States v. Cella*, 568 F.2d 1266 (9th Cir. 1978).

9. Rule 404—Character Evidence Not Admissible To Prove Conduct; Exceptions; Other Crimes

(b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in

order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

10. Fed.R.Evid. 401 recites an expansive definition of relevance and Fed.R.Evid. 402 provides that all relevant evidence is admissible as a general rule. Under Fed.R.Evid. 403, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice."

Appellant asserts that the evidence in question should have been excluded. Among other things, he argues that the fact that the testimony described conduct and statements subsequent to the criminal acts with which he was

## D. *Jury Instructions.*

■ Besbris and Stewart argue that the court erred in refusing to give an instruction explaining "assignment with recourse" under Arizona law. They say that, because the land contracts were assigned with recourse against Western in the event of default, Western's assumption of payments appeared proper to them. The judge refused to give the instruction because he felt it would oversimplify an important issue in a complex case.

The judge explained that the legal definition of "with recourse" was not disputed. He commented that the application of the doctrine to what the individual defendants did, said, and understood was a matter appropriately left for argument by counsel. The crucial issue was not the term's legal definition.

> Instructions are not a substitute for argument to the jury. If the judge fairly instructs the jury as to the applicable principles of law so as to allow counsel on each side sufficient latitude to argue what he considers to be key points in his case, the trial judge has performed his duty.

*United States v. Campanale,* 518 F.2d at 362.

There was no need in this case for an instruction on the meaning of the term "with recourse." Defense counsel had abundant opportunity to argue to the jury their clients' knowledge or ignorance of the fraud. There was no error.

## E. *The Statute of Limitations.*

■ Stewart argues that his participation in the illegal scheme terminated more than five years before the indictment and that his prosecution was untimely.

The mailings upon which the charges were based took place within five years of the indictment. When he joined the scheme by supplying Western with forged and fenceposted contracts, his coparticipants' use of the mails in its furtherance was reasonably foreseeable. Stewart was therefore properly and timely charged. *United States v. Ashdown,* 509 F.2d 793, 798 (5th Cir.), *cert. denied,* 423 U.S. 829, 96 S.Ct. 48, 46 L.Ed.2d 47 (1975). *See also United States v. Outpost Development Co.,* 552 F.2d 868, 870 (9th Cir. 1977); *United States v. Brown,* 540 F.2d 364, 376 (8th Cir. 1976) (*citing Pereira v. United States,* 347 U.S. 1, 8–9, 74 S.Ct. 358, 98 L.Ed. 435 (1954)).

He contends, however, that the mailings with which he was charged were payments intended to "lull" investors into inaction by concealing the fraud. *Citing Gruenwald v. United States,* 353 U.S. 391, 399, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957), he analogizes this to a subsidiary "concealment" conspiracy which does not lengthen the conspiracy's duration for purposes of the statute of limitations.

We disagree. The fraudulent scheme depended heavily on the continued sales of real estate investment paper and it was essential that holders of real estate contracts or secured notes not suspect that fraud was involved. The "lulling" payments concealed the fraud, caused some investors to invest more money, and maintained Western's reputation as a reliable source of investments.

Mailings to victims after they have parted with their money can be "for the purpose of executing" a fraudulent scheme. *United States v. Sampson,* 371 U.S. 75, 80, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962). As in *Sampson,* in this case the scheme was not

---

charged renders it irrelevant. We are convinced, however, that the evidence was relevant to the issues raised. The timing of the statements and conduct attributed to appellant was a factor to be considered by the court in weighing probative value against the danger of unfair prejudice. *Cf. United States v. Hearst,* 563 F.2d 1331, 1336 (9th Cir. 1977) (evidence of subsequent crimes relevant to intent and defense of duress).

Decisions regarding admissibility require application of the balancing formula in the rules, an undertaking unmistakably committed to the discretion of the trial judge. *See United States v. Curtis,* 568 F.2d 643, 645–46 (9th Cir. 1978); *United States v. Butcher,* 557 F.2d 666, 670 (9th Cir. 1977).

fully executed at the time the mailings were made.[11]

### F. Judicial Misconduct.

Baumann asserts that the trial judge improperly interjected himself into the trial and prejudiced the defense.

 We have said repeatedly that trial judges are more than moderators or umpires. The judicial role extends to examining witnesses to clarify the evidence and to controlling the trial and its participants so as to minimize confusion and delay while maximizing orderly, clear, and efficient presentation of evidence. But a judge must be aware of his sensitive judicial position and be on guard to avoid even the appearance of advocacy or partiality. *See United States v. Trapnell,* 512 F.2d 10, 12 (9th Cir. 1975); *United States v. Pena-Garcia,* 505 F.2d 964, 967 (9th Cir. 1974); *United States v. Harris,* 501 F.2d 1, 9–11 (9th Cir. 1974); *United States v. Malcolm,* 475 F.2d 420, 427 (9th Cir. 1973); *Smith v. United States,* 305 F.2d 197, 205 (9th Cir.), *cert. denied,* 371 U.S. 890, 83 S.Ct. 189, 9 L.Ed.2d 124 (1962).

 Charges of judicial misconduct are not dismissed lightly. But we are aware of the enormity of a judge's task and the physical and mental effort required to conduct a long, complex trial.[12] We have reviewed the record with care and have found that, although a few of the judge's remarks were sharp, even sarcastic, they do not represent an abuse of discretion that warrants a new trial. *Cf. United States v. Harris,* 501 F.2d at 9–11 (judge's conduct required reversal).

### G. Sufficiency of the Evidence.

 1. *McDonald.* McDonald was convicted on seven counts of mail fraud and transporting fraudulently obtained property. The government contends that he participated actively in Western's land fraud scheme. McDonald urges that the evidence was insufficient to sustain his convictions

because it did not show participation with intent to defraud. He maintains that he marketed Western's contracts without knowledge of the fraud which he discovered long after he ceased selling the contracts, and that he was in fact a victim of the scheme.

 On appeal we view the evidence and the reasonable inferences therefrom in the light most favorable to the government. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Valentin,* 569 F.2d 1069 (9th Cir. 1978). In reviewing denial of the motion for acquittal we ask: Could the jurors reasonably decide that they would not hesitate to act in their own serious affairs upon factual assumptions as probable as the conclusion that the defendant is guilty? *United States v. Oropeza,* 564 F.2d 316, 321 (9th Cir. 1977); *United States v. Kaplan,* 554 F.2d at 963.

 The government contends that McDonald displayed a willful disregard of the truth in his business activities and that such disregard was tantamount to actual knowledge of the fraud. The prosecution theorized that McDonald was aware of a "high probability" that some or all of the contracts he sold were fraudulent, but that he deliberately shut his eyes to avoid learning the truth. Such conduct will support a criminal conviction. *See Leary v. United States,* 395 U.S. 6, 46 n.93, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969); *United States v. Jewell,* 532 F.2d 697, 701–02 (9th Cir. 1976) (en banc). *See also United States v. Murrieta-Bejarno,* 552 F.2d 1323, 1325 (9th Cir. 1977); *United States v. Esquer-Gamez,* 550 F.2d 1231, 1235 (9th Cir. 1977).

In mail fraud cases, "[o]ne who acts with reckless indifference as to whether a representation is true or false is chargeable as if he had knowledge of its falsity." *United States v. Love,* 535 F.2d 1152, 1158 (9th Cir.), *cert. denied,* 429 U.S. 847, 97 S.Ct. 130, 50 L.Ed.2d 119 (1976) (*quoting Irwin v.*

---

11. As to whether the mailings in question were for the purpose of executing the scheme, see note 16 *infra.*

12. The trial lasted five weeks. The reporter's transcript exceeds 3,300 pages.

*United States,* 338 F.2d 770, 774 (9th Cir. 1964), *cert. denied,* 381 U.S. 911, 85 S.Ct. 1530, 14 L.Ed.2d 433 (1965)).

The government maintains that McDonald's general knowledge of the Arizona real estate business, his knowledge that in 1972 one of his salesmen who had purchased a Western contract had not received regular payments, and his actions in covering his own losses when the fraud was exposed add up to criminally reckless conduct.

 The record, however, is entirely devoid of proof that McDonald had the intent necessary to sustain a conviction. It shows that he merely mentioned that fraud was a possible cause of his salesman's problems and that the delays in payment were satisfactorily explained later.[13] Although McDonald's actions in covering his own investments and loans to Western by demanding bona fide contracts to replace fenceposted agreements sold and pledged to him may have been unfair to his former customers, those acts came long after he ceased selling contracts and could not alone establish fraudulent intent at the time he sold them. Finally, the safeguards he demanded and the precautions he took demonstrate that McDonald dealt cautiously with Western and Hood.[14]

While he was selling the contracts, he had no complaints from investors and invested heavily in the contracts himself. He made several trips to Arizona to meet with Hood and to observe the property offered for sale. When the scheme fell apart, McDonald was one of the big losers.

McDonald's "mere 'involvement in an unsavory, fly-by-night scheme' is not sufficient to establish 'knowing participation in a scheme to defraud.' " *United States v. Piepgrass,* 425 F.2d 194, 199 (9th Cir. 1970) (*quoting Windsor v. United States,* 384 F.2d 535 (9th Cir. 1967)). We cannot infer from the facts in the record that McDonald had, beyond doubt, the specific intent to defraud "because the logical relationship between what he *could have* known and a specific intent has no rational basis." *United States v. Piepgrass,* 425 F.2d at 199–200 (emphasis in original). *See also United States v. Klein,* 515 F.2d 751 (3d Cir. 1975).

 *2. Stewart.* The government's proof showed that Stewart was deeply involved in Western's fraudulent operations. He and those under his direction supplied Western with forged and fenceposted contracts as late as 1972.

The mailings that formed the basis of the counts in the indictment were reasonably foreseeable results of his affiliation with the scheme.

 His conviction on each of five counts related to payments mailed to investors intending to lull them into inaction by concealing the fraud.[15] It was not necessary for the government to show that Stew-

---

13. The salesman's investigation revealed that the original contract obligor had, indeed, intended to purchase the lot in question but had defaulted on his obligation. Western offered to substitute another contract for the one in default but the salesman asked to receive instead, and was given, a refund of his investment.

14. There was evidence that McDonald sold several contracts with his personal assurance that the investment was "good as gold." When he made those remarks, he had no reason to believe otherwise.

McDonald may have in some respects violated a fiduciary duty to his investment clients, but that in itself would not demonstrate the specific intent necessary to sustain a conviction. *Post v. United States,* 132 U.S.App.D.C. 189, 407 F.2d 319, 329 (1968), *cert. denied,* 393 U.S. 1092, 89 S.Ct. 863, 21 L.Ed.2d 784 (1969).

15. It has been recognized that each mailing in execution of a fraudulent scheme constitutes a separate offense of mail fraud. *See, e. g., Atkinson v. United States,* 344 F.2d 97, 98 (8th Cir. 1965); *Hanrahan v. United States,* 121 U.S. App.D.C. 134, 348 F.2d 363, 366 (1965).

Stewart argues that his convictions on counts 8 and 9 cannot stand because, although they are based on mailings of separate checks, each representing a monthly payment on a separate fraudulent contract, the checks were sent to one investor in a single envelope. Thus, he contends, there was but one "mailing."

The argument cannot stand. The essence of the offense is use of the mails to defraud. Each check was mailed pursuant to the scheme to lull investors into a sense of security as to their investments, enabling Western to continue to operate unimpeded. That the two checks, each of which independently helped to execute the

art himself deposited the payments in the mail. His participation in a scheme entailing reasonably foreseeable use of the mail was sufficient to sustain his conviction. *United States v. Outpost Development Co.,* 552 F.2d at 870; *United States v. Brown,* 540 F.2d at 376.[16]

3. *Baumann.* Baumann, who owned Banker's, brokered contracts and mortgages for Western. He was convicted on four counts of mail fraud.

Three of the counts concerned his mailing of monthly payments to investors holding contracts for which Western supplied the funds. The fourth count concerned a letter to Hood, billing him for payments due to an investor holding a contract on which the named obligor had never made a payment.

There was sufficient circumstantial evidence from which the jury could infer Baumann's intent to defraud, including testimony that he had been involved in other fence-posting schemes.[17] The mailings were part of the mechanism employed to insure continuing generation of fraudulently procured revenues. *United States v. Sampson,* 371 U.S. at 80, 83 S.Ct. 173.[18]

### III.

### CONCLUSION

McDonald's convictions are reversed. The convictions of the other appellants are affirmed on all counts.

Bail is revoked now as to the defendants-appellants Baumann, Besbris and Stewart. The mandate will issue at once.

---

plan, were sent in one envelope is of no consequence.

**16.** Stewart contends that to find that the mailings were part of the fraud's execution would be to broaden unduly the construction previously given that element of the crime. We agree that to sustain a conviction there must be more than a showing of a scheme to defraud, defendant's involvement, and the fact that a mailing occurred. *See United States v. Maze,* 414 U.S. 395, 399–402, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974); *Parr v. United States,* 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960); *Kann v. United States,* 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944); *United States v. Kaplan,* 554 F.2d 958, 965 (9th Cir. 1977). There must be proof that the mailing "was in furtherance of the scheme to defraud." *United States v. Kaplan,* 554 F.2d at 965.

Unlike *Maze, Parr,* and *Kann,* however, where mailings took place after the defendants had accomplished their criminal objective, this case resembles more closely *United States v. Sampson,* 371 U.S. at 80, 83 S.Ct. 173, in which the "mailings . . . were designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place." *United States v. Maze,* 414 U.S. at 403, 94 S.Ct. at 650.

**17.** Unlike appellant McDonald, Baumann was closely tied to Western's operations almost from their inception. His relationship with Hood and the manner in which he managed Banker's supplied ample evidence from which the jury could conclude beyond doubt that he participated knowingly in the fraud or, being aware of its "high probability," intentionally shut his eyes to it.

