976 F.2d 738
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
John Newton GRIFFITH, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Robert Philip BERNFELD, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Kimball D. RICHARDS, Defendant-Appellant.
 Nos. 89-50581, 89-50626 and 90-50241.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Feb. 3, 1992.
Decided Sept. 18, 1992.
 
 Before WALLACE, Chief Judge, JAMES R. BROWNING and FERGUSON, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 I. Overview
 
 2
 Kimball Richards, Robert Bernfeld, John Griffith and several others were convicted of multiple counts of bank fraud, mail fraud and wire fraud. They participated in a fraudulent leasing scheme in which Richards' company, Consolidated Allied Companies ("CAC"), agreed to lease musical equipment from Bernfeld's company, Riviera Capital Corporation ("Riviera"), for which Griffith worked. Riviera sold the leases to various financial institutions which were to act as lessor in Riviera's stead. Scheme participants gave the financial institutions false and misleading information to convince them CAC had sufficient resources to make the payments (it did not) and there was sufficient equipment to act as collateral in case of nonpayment (there was not). As new leases were sold, the schemers used the proceeds to make payments on older leases in a Ponzi scheme that eventually unraveled.
 
 
 3
 Richards, who was tried alone, contends the district court (Chief Judge Real) erred in refusing to compel the government to grant use immunity to a witness (a codefendant) who had asserted his Fifth Amendment right not to testify; created an appearance of bias that deprived him of a fair trial; and abused its discretion by erroneously excluding certain defense witnesses and evidence.[1] Griffith and Bernfeld, who were tried together with another codefendant, claim the court (Judge Rea) gave an impermissibly coercive Allen charge; erred by not conducting an evidentiary hearing into the allegations of a note sent to the judge by a juror during deliberations (the "Wobig note"); and engaged in improper ex parte communications with the jury. Griffith also contends he was erroneously held jointly and severally liable for the full amount of restitution owed the defrauded financial institutions.
 
 II. Richards' Claims
 A. Use Immunity
 
 4
 Richards argues the district court erred in denying his motion for an order dismissing the indictment unless the government granted use immunity to defense witness and codefendant Joseph Tanous.
 
 
 5
 The court denied the motion on the ground it had no power to grant immunity to Tanous, who had asserted his Fifth Amendment right not to testify. See United States v. Simtob, 901 F.2d 799, 806 (9th Cir.1990) ("We hardly need to note that only the prosecutor, not the court nor other counsel, has the power to offer immunity to a witness."). Although the court itself may not extend immunity, Richards is correct that in certain circumstances, the court may offer the government a choice between extending immunity or accepting acquittal. Where the defendant makes "an 'unrebutted prima facie showing of prosecutorial misconduct that could have prevented a defense witness from giving relevant testimony,' we will remand the case to the district court to determine at an evidentiary hearing whether the government intentionally distorted the fact-finding process." United States v. Westerdahl, 945 F.2d 1083, 1086 (9th Cir.1991) (quoting United States v. Lord, 711 F.2d 887, 891 (9th Cir.1983)). If the court finds by a preponderance of the evidence that the distortion was intentional, it "should enter a judgment of acquittal for [the defendant] unless the prosecution ... ask[s] the district court to extend use immunity to [the witness] at a new trial." Lord, 711 F.2d at 891-92.
 
 
 6
 Richards contends prosecutorial misconduct is demonstrated by the provision in Tanous' plea agreement that Tanous would not be sentenced until his codefendants had been sentenced. Richards claims the provision ensured Tanous would not testify voluntarily on Richards' behalf for fear of government retaliation at his subsequent sentencing, and could not be compelled to testify as his Fifth Amendment right against self-incrimination would remain in effect until after Richards had been sentenced. See United States v. Paris, 827 F.2d 395, 399 n. 1 (9th Cir.1987) (witness "retained his right not to testify until after sentencing").
 
 
 7
 The provision may have produced the effects Richards describes, but Richards has not shown that governmental misconduct caused Tanous to accept the provision. On the contrary, at the hearing on Richards' motion the prosecutor told the court, without contradiction from Richards' counsel, that Tanous had requested he be sentenced last, and that the government had informed Tanous he could be sentenced any time he desired. Because Richards has not made the necessary unrebutted prima facie showing that prosecutorial misconduct caused Tanous to invoke his Fifth Amendment privilege against self-incrimination, no remand is necessary.[2]
 
 B. Actual or Apparent Bias of Trial Court
 
 8
 Richards' claims that the court was or appeared to be biased against him are similarly unavailing. Chief Judge Real assigned Richards' retrial to himself after the judge to whom the case was originally assigned became involved in another lengthy trial. The reassignment was routine and created no appearance of partiality. Moreover, Richards did not object to the transfer and concedes he cannot now raise it as a ground for reversal.
 
 
 9
 The district court's evidentiary rulings and comments during trial did not create an appearance of bias sufficient to deprive Richards of a fair trial. The trial court did sustain most of the government's objections to Richards' cross-examination of government witnesses, but the vast majority were properly sustained,[3] and the court also overruled many government objections. The court admonished Richards' counsel he was "off track" or asking inappropriate questions only after counsel persisted in pursuing a line of questioning to which the court had sustained government objections.
 
 
 10
 A district judge may "participate in the examination of witnesses for the purpose of clarifying evidence, confining counsel to evidentiary rulings, controlling the orderly presentation of the evidence, and preventing undue repetition of testimony." United States v. Mostella, 802 F.2d 358, 361 (9th Cir.1986). "This court will order a new trial ... only if the record 'discloses actual bias on the part of the trial judge or leaves the reviewing court with an abiding impression that the judge's remarks and questioning of witnesses projected to the jury an appearance of advocacy or partiality.' " Id. (citations omitted). The trial court's intervention denies the defendant a fair trial only in cases of "rather extreme overstepping of the proper judicial role." Id. at 362.
 
 
 11
 The judge did not overstep his role. The court's comments were not "pro-prosecutorial," as Richards contends; the vast majority were neutral questions aimed at clarifying the witnesses' answers. The responses may have been favorable to the prosecution in some instances, but in others they benefited the defense.
 
 
 12
 Richards challenges the concluding question the court put to Richards about a diploma found in Richards' residence, purportedly awarding him a "master of signal device engineering" from the University of San Fernando Valley.[4] As Richards contends, the judge may have inappropriately conveyed his skepticism. However, his question was not equivalent to the comments we found denied the defendant a fair trial in United States v. Pena-Garcia, 505 F.2d 964, 965-67 & nn. 1-3 (9th Cir.1974), a case in which the judge repeatedly accused a witness of committing perjury. We said in United States v. McDonald, 576 F.2d 1350 (9th Cir.1978) that "we are aware of the enormity of a judge's task and the physical and mental effort required to conduct a long, complex trial. We have reviewed the record with care and have found that, although a few of the judge's remarks were sharp, even sarcastic, they do not represent an abuse of discretion that warrants a new trial." Id. at 1358 (footnote omitted). Further, even when a judge's question was inappropriate, an instruction to the jury "not to assume that [the court's] questions expressed any opinion on the case" is usually sufficiently curative. See United States v. Laurins, 857 F.2d 529, 538 (9th Cir.1988); see also United States v. Bradshaw, 690 F.2d 704, 712 (9th Cir.1982) (instruction that jury alone should determine facts and credibility and that nothing court said was meant to suggest appropriate verdict is "generally adequate"). Here, the court instructed:
 
 
 13
 Let me caution you again that nothing that I have said in these instructions, nothing in the form of the verdict which has been prepared for your use, no question of mine during the trial, no admonition of mine to any counsel, no ruling I have made on any matter of evidence is to suggest in any way what verdict I think you should find. Whatever verdict you return, it is your exclusive duty and responsibility and should not be affected by any outside influence.
 
 C. Evidentiary Rulings
 
 14
 Richards claims the district court erroneously excluded certain defense witnesses and evidence. We reverse evidentiary rulings only for abuse of discretion and only if the error more likely than not affected the verdict. United States v. Emmert, 829 F.2d 805, 808 (9th Cir.1987).
 
 
 15
 Excluded defense witness Brian Bowlin allegedly would have testified prosecution witness Gerald Burnett told Bowlin that Burnett lied in implicating Richards at Richards' first trial; that Richards had done nothing wrong; but that Burnett had to say what the government told him to say because he had made a deal with the government in order to protect his family. Federal Rule of Evidence 608(b) prohibits proof by extrinsic evidence of specific instances of a witness' conduct to attack his credibility. Citing Rule 608(b), we held in United States v. Benny, 786 F.2d 1410, 1419-20 (9th Cir.1986), that the district court did not abuse its discretion in refusing to allow defendant to offer his own testimony or other "extrinsic evidence" to contradict the testimony of certain prosecution witnesses that they had not received special consideration from the prosecutor. Similarly, here the court did not abuse its discretion by refusing to allow Bowlin to contradict Burnett's account of his motives for testifying against Richards. Richards had ample opportunity to challenge Burnett's truthfulness on cross-examination. See id.
 
 
 16
 Excluded defense witnesses Sharon and William Singletary and Paul Campbell allegedly would have testified certain prosecution witnesses had expressed hostility toward Richards and said they would do anything to "get" him. Richards cross-examined the prosecution witnesses extensively about their reasons for testifying against him; the jury had sufficient information to assess the witnesses' biases and motives. See United States v. Jackson, 882 F.2d 1444, 1447 (9th Cir.1989).
 
 
 17
 The court did not commit reversible error in denying Richards' motion to reopen to allow defense witness Rick Walker to rehabilitate Richards, whose credibility in testifying as to his knowledge of a phony credit union had been attacked on cross-examination.[5] On direct, Richards claimed he first heard of the phony credit union in 1984. On cross-examination, Richards admitted that in 1981, he had listed the nonexistent "Motion Picture Credit Union" on an application to lease a car. On redirect, Richards explained one of his employees had brought him the application to sign; the vehicle was leased for an artist Richards managed; and the agent at the car dealership was a friend of Rick Walker's. After resting the defense, Richards moved to reopen to allow Rick Walker to testify in support of Richards' explanation.
 
 
 18
 Even assuming the court erred in denying the motion, it is not more likely than not that the denial of the motion affected the verdict. A number of prosecution witnesses testified Richards knew of, encouraged and perpetuated false representations about the phony credit union at the time of the fraudulent leasing scheme. Whether Richards first heard about the credit union in 1984, as he contended, or in 1981, as the prosecution sought to prove, was tangential.
 
 
 19
 Finally, Richards claims the district court erroneously excluded evidence that Richards offered to show that Bernfeld had duped Richards, who was an innocent "fall guy." The offer of proof was: "[W]e would intend to show that on three occasions prior to this case that [Bernfeld] became a financial adviser for three other companies; that they submitted phony financials; that the companies went into bankruptcy; and that the principals of those companies were left holding the bag civilly and possibly criminally, as a result. We intend to show this is Bernfeld's modus operandi."
 
 
 20
 Federal Rule of Evidence 404(b) generally bars evidence of other crimes, wrongs or acts of a third party to show propensity or conforming conduct, although such evidence may be admissible to prove identity through a modus operandi theory. See United States v. McCourt, 925 F.2d 1229, 1231, 1235 (9th Cir.1991); Hirst v. Gertzen, 676 F.2d 1252, 1262 (9th Cir.1982). However, we construe the modus operandi exception narrowly. See id. "An inference of identity from prior crimes can only arise when the elements of the prior offenses and the charged offense, singly or together, are sufficiently distinctive to warrant an inference that the person who committed the prior offense also committed the offense on trial." United States v. Powell, 587 F.2d 443, 448 (9th Cir.1978). Richards' offer of proof did not meet these high standards. Nothing in the offer indicated the three companies allegedly involved in the prior scams were unwitting dupes rather than knowing co-conspirators, nor that Bernfeld had duped the companies in a way that might make the occurrences relevant. Richards sought to use proof of Bernfeld's previous scams to demonstrate Bernfeld's propensity toward fraud and to suggest Bernfeld had tricked Richards into participating in the fraudulent scheme charged in this case, a purpose we have disapproved. See McCourt, 925 F.2d at 1235 (citing United States v. Dalfonso, 707 F.2d 757, 762 (3d Cir.1983)).[6]
 
 III. Bernfeld's and Griffith's Claims
 A. The Allen Charge
 
 21
 Approximately eleven days after the jurors began deliberating, the foreman sent a note to the court indicating the jury was deadlocked. The judge called the jury into the courtroom and instructed the jurors as set out in the margin.[7] Bernfeld and Griffith contend the instruction was an impermissibly coercive Allen charge. In evaluating the coerciveness of an Allen charge we examine the instruction in context. United States v. Beattie, 613 F.2d 762, 764 (9th Cir.1980). We consider the form of the instruction, the period of deliberation following the charge, the total time of deliberation, and any indicia of pressure or coercion on the jury. United States v. Foster, 711 F.2d 871, 884 (9th Cir.1983). Because the defendants did not object to the charge, we review only for plain error. United States v. Marchini, 797 F.2d 759, 767 (9th Cir.1986).
 
 
 22
 Griffith and Bernfeld first contend the court gave two Allen charges, the first before Juror Garza spoke and the second after Juror Wobig spoke, violating the rule of this circuit that repeating an Allen charge to a jury is reversible error per se. See United States v. Seawell, 550 F.2d 1159, 1163 (9th Cir.1977). Even if we characterize the court's remarks as encompassing two Allen charges, rather than one interrupted by comments from the jurors, the per se rule does not apply. As Seawell explained, the danger in repeating an Allen charge lies in the possibility that jurors who have been charged once, return to deliberate, find themselves deadlocked again, and are then charged a second time, will believe they acted contrary to the first instruction and are actually required to reach a verdict. Id. There was no such danger here. Whether characterized as one Allen charge or two, all of the court's comments were delivered before the jurors returned to their deliberations.
 
 
 23
 Griffith and Bernfeld also contend the court's statement, "[I]f you don't reach a verdict or if you stop at this point in time without attempting to go further in reexamining your positions, then we're all in a lot of trouble," was the same as the instruction found impermissibly coercive in Jenkins v. United States, 380 U.S. 445, 446 (1965) ("You have got to reach a decision in this case."). Viewed in context we do not believe it could have been perceived by the jurors as an instruction that they were required to reach a verdict or as a threat of punitive consequences if they failed to do so. The court stated unambiguously both before and after the challenged remark that a verdict was not mandatory and that each juror was to decide the case for himself or herself and was not to abandon his or her conscientious convictions to reach a verdict.
 
 
 24
 Griffith and Bernfeld argue the court improperly "endorsed a majority view orientation." Although the judge advised any jurors in the minority to consider their views in light of the majority's view (but not to give up any honestly held convictions simply because the numbers were against them), he also advised any jurors in the majority to reconsider their views.[8] The instruction was no more coercive than the instruction the Supreme Court approved in Allen v. United States, 164 U.S. 492, 501 (1896) ("[The jury was instructed] that, if much the larger number were for conviction, a dissenting juror should consider whether his doubt was a reasonable one which made no impression upon the minds of so many men, equally honest, equally intelligent with himself. If, upon the other hand, the majority was for acquittal, the minority ought to ask themselves whether they might not reasonably doubt the correctness of a judgment which was not concurred in by the majority.").
 
 
 25
 Griffith and Bernfeld find fault with the judge's references to the time and effort expended on the trial. We have recognized that "stress[ing] the expense of the case in terms of time, effort, and money" has "potential for abuse," United States v. Mason, 658 F.2d 1263, 1266-67 (9th Cir.1981); however, we have found reversible error only where the court "did not simultaneously stress the fact that 'any agreement should not be reached in violation of the honest conviction of any one of the jurors,' " id. at 1267 (citation omitted). Here, the court reminded the jurors several times not to give up honestly held convictions simply to reach a verdict.[9]
 
 
 26
 The time spent in deliberations, see Foster, 711 F.2d at 884, argues against a finding of impermissible coercion. The jury deliberated about eleven days before receiving the Allen charge; continued deliberating another four days before reaching a verdict as to one defendant; deliberated another few days before reaching a verdict as to a second defendant; and deliberated still another few days before announcing themselves deadlocked as to a third defendant. We have found no coercion in cases involving much shorter periods of deliberation after the Allen charge. See, e.g., United States v. Wauneka, 842 F.2d 1083, 1088-89 (9th Cir.1988) (no evidence of coercion when jury returned verdict shortly after Allen charge); United States v. Bonam, 772 F.2d 1449, 1450-51 (9th Cir.1985) (verdict reached one and one-half hours after Allen charge was not rendered in such a short time that it raised suspicion of coercion). Further, the jury rendered discriminating verdicts, finding Griffith not guilty on one count but guilty on all others, and remaining deadlocked as to the third defendant. See Foster, 711 F.2d at 884 (fact that three codefendants were acquitted after Allen charge weakened defendant's argument jury was coerced).
 
 
 27
 The note from Juror Wobig does indicate the instruction was delivered in an atmosphere of some frustration over the inability to reach a verdict. See Bonam, 772 F.2d at 1451.
 
 
 28
 In sum, although we think the instruction viewed " 'in its context and under all the circumstances,' " Beattie, 613 F.2d at 764 (citation omitted), was marginal, we do not find reversible error. As we said in Marchini, "[w]hile a more difficult question would have been raised had an objection been made, we hold that the instruction did not constitute plain error." 797 F.2d at 767.
 
 B. The Wobig Note
 
 29
 Griffith and Bernfeld contend the district court should have conducted an evidentiary hearing regarding the allegations in the note handed the judge by Juror Wobig.[10] The note contains two charges: that two jurors were bribed, and that one juror accused two others, within earshot of the rest, of having been bribed.
 
 
 30
 The first charge--that two jurors had been bribed--would, if true, constitute jury tampering, deemed presumptively prejudicial. See Remmer v. United States, 347 U.S. 227, 229 (1954). Normally, the district court would have to hold an evidentiary hearing to determine whether there was jury misconduct, but there is no need to do so when the court "can determine from the record before it that the allegations are without credibility." United States v. Navarro-Garcia, 926 F.2d 818, 822 (9th Cir.1991).
 
 
 31
 The accusation that two jurors had been "bought" is not credible. Assuming the charge was in fact made, it was delivered during heated discussions that resulted in a deadlock. The person who reported the accusation was one of its subjects; it is unlikely she would have repeated the charge against her if there was any truth to it. Moreover, the note indicates there was no evidence of bribery; the accuser apparently surmised (or joked) that the only reason two jurors would disagree with his or her view of the case was that they had been bribed.
 
 
 32
 Nor was an evidentiary hearing into the second allegation necessary. The charge that during deliberations one juror had accused two others of bribery would, if true, be significant because of the possible effect of the incident on the deliberations (e.g., that it made the jury feel pressured to decide the case a certain way). Federal Rule of Evidence 606(b) expressly forbids juror testimony "as to any ... statement occurring during the course of the jury's deliberations or to the effect [it had] upon ... any ... juror's mind or emotions as influencing the juror to assent to or dissent from the verdict...." See generally Tanner v. United States, 483 U.S. 107, 116-27 (1987) (discussion of rationale behind 606(b)).
 
 
 33
 C. The Court's Ex Parte Contacts with The Jury
 
 
 34
 Eight days after delivering the Allen charge, the court told counsel, "When I've sent the jury home since giving the Allen charge, I've asked them whether or not they're making progress, and the foreman ... has reported to me that they are making substantial progress." Griffith and Bernfeld contend the ex parte contacts to which the judge referred were improper.
 
 
 35
 In United States v. Frazin, 780 F.2d 1461 (9th Cir.1986), the jurors sent a note to the judge stating they were deadlocked and asking for instructions. Without communicating with defendants or their counsel, the court sent the jury a note: "Please continue your deliberations in the above entitled case." Id. at 1464. We held that "[e]x parte communications from the judge to the jury violate a defendant's right to due process of law." Id. at 1469. However, we also held that reversal was not required if the government could prove beyond a reasonable doubt that the error did not contribute to the verdict. Id. at 1469-70. We looked to three factors to determine whether the error had contributed to the verdict: "[f]irst, ... the probable effect of the message actually sent, second, the likelihood that the court would have sent a different message had it consulted with appellants beforehand and third, whether any changes in the message that appellants might have obtained would have affected the verdict in any way." Id. at 1470. We concluded that the error had not contributed to the verdict and affirmed.
 
 
 36
 In this case, as in Frazin, the communications were not inherently or facially coercive. See id. The court's question, "Are you making progress?", implied no bias, threat or warning; it was less inherently coercive than the Frazin instruction, "[C]ontinue your deliberations," which did not require reversal.
 
 
 37
 Also as in Frazin, the jurors' response in this case indicates they were not coerced by the ex parte messages. The Frazin court found it significant that the jury returned its verdict three and one-half hours after the ex parte instruction was delivered, a length of time that "demonstrate[d] that [the jury] reached its decision based solely on its own reasoned consideration of the evidence and the law, and not as the result of actual or perceived judicial pressure." Id. In this case, although the jurors were asked about their progress on each day they deliberated after receiving the Allen charge on July 19, they did not return a verdict as to the first defendant until July 26. They did not reach a verdict as to the second defendant until August 1, and announced themselves deadlocked as to the third defendant on August 4.
 
 
 38
 We doubt the judge would have sent a different message had he consulted with counsel. When the judge did tell counsel he had been asking the jurors each day if they were making progress, they neither objected nor requested any change in the wording. The question was entirely neutral. We think it beyond reasonable doubt that the defendants could not have secured any revision to the message that might have affected the verdict; they have suggested none. Cf. id. at 1471.
 
 
 39
 D. Joint and Several Liability for Full Restitution
 
 
 40
 Griffith argues the district court improperly held him jointly and severally liable for restitution to all of the financial institutions defrauded by the leasing scheme. The court based its order on the recommendation of the Presentence Report, which found restitution appropriate under the Victim and Witness Protection Act ("VWPA"). The legality of a sentence under the VWPA is reviewed de novo. United States v. Smith, 944 F.2d 618, 621 (9th Cir.1991).
 
 
 41
 Griffith was convicted of criminal conduct involving all of the financial institutions to which he was ordered to pay restitution except Security Pacific. Under United States v. Sharp, 941 F.2d 811 (9th Cir.1991), the award to Security Pacific exceeded the scope of the court's sentencing authority under the VWPA. See id. at 815 ("Even when the offense of conviction involves a conspiracy or scheme, restitution must be limited to the loss attributable to the specific conduct underlying the conviction.").
 
 
 42
 "Since we hold that the restitution award is improper under [Sharp ], we have no occasion to address [Griffith's] other contentions regarding the propriety of the award."[11] United States v. McHenry, Nos. 90-10423, 90-10424, slip op. 5691, 5698-99 (9th Cir. Dec. 27, 1991, as amended May 19, 1992, and reprinted with corrections June 17, 1992).
 
 
 43
 The order that Griffith pay restitution is VACATED AND REMANDED; the balance of the sentence will remain intact. See id. at 5699.
 
 
 44
 The convictions of Griffith, Bernfeld and Richards are AFFIRMED.[12]
 
 
 45
 FERGUSON, Circuit Judge, dissenting in part.
 
 
 46
 I dissent from the part of the Court's disposition holding that the district court's comments to the jury, upon being informed that after eleven days of deliberations the jury was deadlocked, did not constitute an impermissibly coercive charge.
 
 
 47
 The judge told the jury, "[I]f you don't reach a verdict or if you stop at this point in time without attempting to go further in reexamining your positions, then we're all in a lot of trouble."
 
 
 48
 The majority cannot contend, nor does it contend, that the plain, ordinary words do not constitute a threat of punitive consequences. Furthermore, I submit that the courtroom can be an intimidating place, and the judge is the most powerful and authoritative figure in it. I cannot imagine that anyone--particularly a juror who has been sequestered by United States Marshals--could hear the judge's statement and understand it as anything other than a threat.
 
 
 49
 Here, the words used, and the context in which they were used, carried a threat of punitive consequences. The coercion here is more severe than that in Jenkins v. United States, 380 U.S. 445, 446 (1965), where the Supreme Court held that the words "[y]ou have got to reach a decision in this case" constituted an impermissibly coercive Allen charge which warranted reversal. The judge never retreated from or softened his threat.
 
 
 50
 To claim that jurors don't perceive words as they are spoken is to reduce trials to unfortunate games of chance. When judges in plain words tell us that "we're all in a lot of trouble" it means that we are. The judicial system is in worse trouble when we hold that the judge didn't mean it even though he never retracted or disclaimed his threat.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 The trial before Chief Judge Real was a retrial. The jury in Richards' first trial acquitted him of four counts and deadlocked on the remaining thirty-four
 
 
 [2]
 Tanous' declaration, which was not submitted to the district court and is not a part of the record on appeal, is unnecessary to our decision, and we deny the government's motion to add it to the record
 
 
 [3]
 On appeal, Richards does not directly challenge the individual evidentiary rulings discussed in this section, but argues the number of government objections sustained created an appearance of bias
 
 
 [4]
 Richards admitted the diploma was false but contended he had never used it or told anyone about it. The court asked him why it was created, and Richards answered ambiguously, "Because we were trying to develop the school at that time into a school to teach signal device engineering." The court rephrased, asking, "Why was your name put on the University of San Fernando Valley diploma?" Richards responded, "Well, I didn't put it on myself." The court asked a third time, "Why was your name put on there?" Richards replied, "I can only assume that it was put there in the process of making one diploma into another." The court then asked, "You're not telling us that you didn't know anything about why and how your name got on there?"
 
 
 [5]
 To convince the financial institutions that bought the leases that CAC had sufficient resources to be a reliable lessee, scheme participants told the institutions CAC had ten million dollars in a certain credit union. The credit union did not exist. Its telephone number rang at a pay telephone in CAC's offices
 
 
 [6]
 In Dalfonso, the defense to a narcotics distribution conspiracy charge was entrapment. The defendant sought to impeach the government's informant "by showing that at the same time the informant was convincing defendant to get drugs, he was convincing other people to give him money for nonexistent Kruggerands." McCourt, 925 F.2d at 1235. McCourt approved Dalfonso's holding "that defendant was not entitled to use previous scams to demonstrate the informant's propensity to defraud or influence his victims, and to suggest that the defendant had been tricked into doing what he ought not do." Id
 
 
 [7]
 THE COURT: All right. I'm going to give you a few thoughts that hopefully will help you in your deliberations
 First of all, I think you recognize that this is an important case. As you know, we've spent considerable time and effort on it, you, the court, counsel, all of us.
 Each of you, of course, must decide the case for yourself, but you should do so only after considering all of the other evidence--considering all of the evidence and discussing it fully with the other jurors and listening to the view of your fellow jurors.
 You should not be afraid to change your opinion if you think you're wrong. But do not come to a decision simply because the other jurors think it's right.
 Now, the case has taken a great deal of time and effort to prepare and to try. There is no reason to think that it could be better tried or that another jury is better qualified to decide it. It is important, therefore, that you reach a verdict if you can do so conscientiously.
 Therefore, if it looks at some point as if you may have difficulty in reaching a unanimous verdict and if the greater number of you are agreed on a verdict, the other jurors may want to ask themselves about the basis for their feelings when a substantial number have reached a different conclusion. You should not hesitate to reconsider your views from time to time and to change them if you are persuaded that this is appropriate.
 It is important that you attempt to return a verdict but, of course, only if each of you can do so after having made his or her own conscientious determination. Do not surrender an honest conviction as to the weight and effect of the evidence simply to reach a verdict.
 I know you have conscientiously listened to the trial and the evidence, arguments, instructions of the court and that you have been conscientiously trying to reach a verdict in your deliberations. So I would like you to consider these matters that I just informed you of, and I'd like you each to examine your own position to see if it's not possible to reach a verdict.
 Yes, Ms. Garza.
 JUROR GARZA: What if some of us feel that it's just hopeless[?] You know, we just keep going around and around. There's a lot of us that feel that way.
 THE COURT: I recognize that, and I know you've been at it a long time. But I'm still going to ask you to keep going at it, toward a verdict in your deliberations.
 Maybe with a few of the thoughts I've given you here now perhaps something could be done. I don't know.
 JUROR GARZA: Even if we have already decided?
 THE COURT: No. I'm not going to let you go now. If that's your question, the answer is "no." I want you to keep deliberating. I want you to keep working at it. I'm not satisfied as of this moment that you can't reach a verdict. I'm not convinced of that as of now. I guess if that answers your question, then that's my answer.
 JUROR GARZA: You don't think any of us can make up our own minds? Is that what you're saying?
 THE COURT: I'm not going to engage in that type of comment. I don't know. I hope you can make up your mind, but this isn't the first time this has come about. I mean, sometimes jurors can't reach a verdict, but after the court encourages them a little bit, gives them different approaches to things, they do reach verdicts sometimes. So I want you to continue on in your deliberations. It's as simple as that.
 So you all want to go home at 4:00 o'clock today?
 FOREMAN ATTEW: I think it would be the best plan, Your Honor.
 THE COURT: All right. Well, maybe you want to go home right now. [It was then just after 9:00 a.m.] I don't know. But I want you to come back at 9:00 o'clock in the morning [tomorrow].
 Do you all want to separate now and then return?
 FOREMAN ATTEW: Yes, I think that would be a good idea, Your Honor.
 THE COURT: Do all of you agree with that?
 All right. You have a question?
 JUROR WOBIG: I'd like to send this note up to you, Your Honor. The bailiff said I couldn't do it through her. I would like to send it up to you.
 THE COURT: All right. Hand it to my clerk. [The court silently read the note. It said: "Your honor there is one juror who has charged that myself and one other juror has been bought or we would not see the case as we see it. Juror # 4"] All right. Well, I read your note. I am not sure what I should say at this point in response to it.
 JUROR WOBIG: I thought that you ought to be advised of it.
 THE COURT: I see. Well, I am now advised of what the note says, yes.
 JUROR WOBIG: All right. Thank you.
 THE COURT: All right. Well, I'm going to let you separate now, and I want you to think about what I just said, that if you don't reach a verdict or if you stop at this point in time without attempting to go further in reexamining your positions, then we're all in a lot of trouble.
 I'd like each one of you to think about it if you can. As I just said to you, it's not mandatory. I can't tell you that it's mandatory because that's not the law. But I would like you to continue working at it.
 As it says in that instruction I just gave you, if the greater number of the jurors are voting one way, then the ones that are in the minority ought to think about that. Well, just taking hypothetically--I don't know how you stand, but let's say two people feel one way and ten people feel the other way. As the instruction says, maybe the two people should examine their position because there's a substantial number on the other side. But they should not surrender their convictions merely because the numbers are against them.
 Of course, on the other side of the coin, the ten that are in the majority on a given vote, that doesn't mean that you shouldn't also look at it to see if you're right. Merely because you have the greater number doesn't mean you shouldn't reexamine your position.
 So I think that's something you should think about, also.
 
 
 [8]
 There may have been no minority or majority--the jury may have been split evenly, or split differently as to different counts and/or defendants
 For this reason, the defendants' reliance on United States v. Sae-Chua, 725 F.2d 530 (9th Cir.1984), is misplaced. In that case, we found an Allen charge unduly coercive because the judge had been told eleven jurors favored conviction and one juror, known to the judge, did not, and because the dissenter knew the judge knew who he was. Id. at 532. "Under these circumstances the charge could only be read by the dissenting juror as being leveled at him. He could hardly escape reasoning that the judge was not likely to believe that he could persuade the opposing eleven to adopt his position ... and that he, individually, was being urged by the judge to reconsider his vote." Id.
 Griffith and Bernfeld reason that because the note handed the judge by Juror Wobig said two jurors had been charged with having been "bought," the two allegedly so accused must have been the only two who wanted acquittal, and so must have thought the judge was referring specifically to them and urging them to change their minds and vote for conviction. There is nothing in the record to support this contention. We do not know now, and the judge did not know then, how the jury was split.
 
 
 [9]
 Griffith and Bernfeld claim the judge indicated to the jurors that the jury in Richards' first trial had deadlocked, thereby exerting additional pressure to avoid an impasse at all costs, when he said, "This isn't the first time this has come about." The jurors could not have understood the comment as a reference to the deadlock in Richards' first trial, of which they knew nothing. The comment was intended and undoubtedly understood as a reference to the fact that occasionally jurors who believe themselves deadlocked are able to reach a unanimous decision after receiving an Allen charge, as shown by the statement that immediately followed the remark: "I mean, sometimes jurors can't reach a verdict, but after the court encourages them a little bit, gives them different approaches to things, they do reach verdicts sometimes."
 
 
 [10]
 Preliminarily, the government argues the issue was waived because the defendants did not request an evidentiary hearing. However, the day following the receipt of the Wobig note Bernfeld and Griffith moved for a mistrial on the basis of the note. A request for an evidentiary hearing was implicit in the motion for mistrial if such a hearing were necessary to resolve the motion
 
 
 [11]
 However, on remand the district court should consider 18 U.S.C. § 3664(a) (enumerating factors to consider in determining whether to award, and amount of, restitution)
 
 
 [12]
 Griffith's motion to file his reply brief late is granted